## NAOMI N. WHEELER, Appellant, v. FIDELITY & CASUALTY COMPANY OF NEW YORK.

In Banc, May 22, 1923.

1. **ACCIDENT INSURANCE:** Cause of Death: Probability Upon Probability. Mere probability is not proof, and the sum of two probabilities is only a probability.

2. ———: ———: ———: **Chain of Causation.** On evidence dealing only with tangible external facts and conditions that followed in an unbroken chain of sequence from the initial injury of the insured to his death, there being no other facts or circumstances reasonably accounting for his death, a jury would be justified in finding that the injury was the cause of his death.

3. ———: ———: ———: ———: **Injury to Eye: Syphilis In Tertiary Stage: Blood Clot in Heart: Bacteria: Inference Upon Inference.** The insured, a traveling salesman fifty-four years old, his eyes in a normal healthy condition, on his arrival by train in another state visited a physician who removed from his left eye an angular sharp-edge cinder about the size of a mustard seed; it had been imbedded in the cornea and to remove it a local anaesthetic and an "eye-spud" were necessary; there was a marked conjunctivitis of the eye, and local treatment was prescribed; three weeks later he returned to his home in the city, and from that time on until his death, more than three months later, the eye was daily treated by an occulist, who found a superficial ulcer in the inner and upper margin of the cornea; this initial ulcer healed, but others appeared in rapid succession, until three-fourths of the cornea was involved, but at the time of his death the eye appeared practically healed; when he returned home, his general health was good and normal, but his flesh gradually fell away, his face grew thin and drawn, he became increasingly nervous and mentally distressed. Two years previously he had been treated for a considerable time for syphilis, and upon his return to his home ·this treatment was renewed, but the disease was at that time in a late secondary or early tertiary stage, and there were no active manifestations of it: he went regularly to the office of his physicians in an automobile, and on one of these trips he suddenly died. An autopsy disclosed marked sclerosis of the arterial system, including the coronary artery, which feeds arterial blood to the heart; in the posterior coronary artery there was extensive sclerosis and calcifi-

cation, and at one point the arterio-sclerotic thickening was such that the passageway for the blood was reduced from a third to a half of its normal size; at this narrow point a blood clot was found, which had entirely closed the artery, and thereby shut off the flow of blood, and this clot or thrombus was the immediate cause of his death. The physicians testified that a blood clot may be caused solely by the eddying of the blood when forced through a constricted part of the artery, or by a particle of calcareous deposit on the wall of the artery detaching itself and entering the blood stream, but that the formation of a clot from those causes is unusual; that the usual cause is an impaired condition of the blood resulting from the presence of bacteria or their toxines in the blood itself, and that a clot is formed by this condition when the arteries are perfectly normal, but that diseased arterial walls tend to facilitate its formation; that bacteria are essential to infection, and an ulcer in the eye, through the medium of infection distributed through the circulating blood, could form a blood-clot in the coronary artery; that it is probable that the clot which caused the death of insured was in turn caused by bacteria or toxines; that while it is possible for organisms from tertiary syphilis to be in the free circulation of the blood, such infection is not at all probable; that it was, therefore, highly probable that the blood clot, which effected the insured's death, was caused by the infection of the eye. *Held*, that, upon this evidence, there being no other facts reasonably accounting for insured's death, the question whether the infection of the eye was the cause of his death should have been submitted to the jury, and there being an unbroken chain of causation from the infection of the eye to the formation of the blood clot in the heart, a finding that the ulceration of the eye caused his death would not be the piling of inference upon inference.

4. ———: ———: Proximate and Independent Cause: Concurring Agencies: Other Disease. Two years previously the insured had for some time been treated for syphilis, but at the time of his injury the disease was in its early tertiary stage, and there were no active manifestations of it, and the physicians were of the opinion that it was not an active agent in bringing about his death, but that its only influence was to create a condition that made it more difficult to cure his ulcerated eye and easire for the infection originating therein to cause the formation of a blood-clot in his heart, which was the immediate cause of his death. *Held*, without an analysis of the apparent rather than the real divergence in decisions on the question whether the general rule of proximate cause is controlling, that if, in the peculiar condition of health of an insured upon whom an injury has been accidentally inflicted, such injury appears as the active and efficient cause that

sets in motion agencies that result in death, without the intervention of an independent force, such injury should be regarded as the sole and proximate cause; and low vitality or physical infirmity, having deprived nature of her normal power of resistance to attack, does not rise to the dignity of a concurring cause, but is to be regarded as a passive ally of the agencies set in motion by the injury.

5. **EVIDENCE: Negative in Character.** Negative evidence is not inadmissible merely because it is negative in character. In an action on an accident insurance policy, in which it is alleged that the insured received an accidental injury to his eye which became so infected as to ultimately cause a fatal blood-clot in the heart, it is clearly relevant, on direct examination, to ask a physician whether, aside from the injury to the eye, there was sufficient findings at the autopsy of an organic condition of the heart, arteries and kidneys which could have caused the death of the insured, even though the question may elicit a negative answer, or be asked in an attempt to prove a negative.

6. ————: **Weather Bureau Report: Hearsay.** Observations of the weather, made at various points in Kansas where the Government had established recording stations, were forwarded at the end of each month to an official of the bureau at Topeka, and that official there systematized and tabulated the data contained in the reports, and sent them on to Kansas City, where they were further arranged and put into final form for publication, and in that form they were printed, and as printed they are kept in the United States Weather Bureau at Kansas City. *Held*, that the printed record kept by the bureau in Kansas City was competent evidence to prove the temperature at the town in Kansas on the day that plaintiff there received his injury, and was not incompetent as hearsay, but though made extrajudicially and by a person not under oath and not subject to cross-examination, was originally made with the intent that it should be kept as a memorial to be referred to and used as evidence.

Appeal from St. Louis City Circuit Court—*Hon. Benjamin J. Klene,* Judge.

REVERSED AND REMANDED.

*Kinealy & Kinealy* for appellant.

(1)   It is trite law that on demurrer to the evidence plaintiff is to be given the benefit of all inferences that

can be fairly drawn from the evidence. Murrell v. Railroad, 279 Mo. 92; Link v. Hamlin, 270 Mo. 319; Maginnis v. Railroad, 268 Mo. 667. (2) And liberality in drawing such inferences will be indulged in as to facts, the proof of which are within the control of the defendant. Schneider v. Maney, 242 Mo. 36, 43; 22 C. J. 81. (3) Where repugnant or inconsistent clauses appear in a policy of insurance the courts will give effect to the one which is most favorable to the insured. Shoe Co. v. U. S. Cas. Co., 172 Mo. 135; Drucker v. West Indem. Co., 204 Mo. App. 516; Canning Co. v. Guar. & Acc. Co., 154 Mo. App. 327; Burnet v. Ins. Co., 68 Mo. App. 343. (4) The evidence in this case showing the accident to the eye and that same could have caused the thrombus which was the direct and immediate cause of death, made the case one for the jury to decide. 1 C. J. 453; 14 R. C. L. 1265, sec. 440; De Maet v. Storage Co., 231 Mo. 615; Fetter v. Fid. & Cas. Co., 174 Mo. 256; Bellows v. Insurance Co., 203 S. W. (Mo.) 978; Campbell v. Aetna L. Ins. Co. 222 S. W. (Mo.) 778; Summers v. Fid. & Cas. Co., 84 Mo. App. 605; Driskell v. Ins. Co., 117 Mo. App. 362; Young v. Ry. Mail Assn., 126 Mo. App. 325; Beile v. Protect. Assn., 155 Mo. App. 629; Goodes v. Order U. C. T., 174 Mo. App. 330; Greenlee v. Cas. Co., 192 Mo. App. 303; Anderson v. Mut. Ben. Health & Acc. Assn., 231 S. W. (Mo. App.) 75. (5) This is particularly so, where, as in this case, there is a decided and continuous deterioration from the time of the accident to the death. Sharp v. Railway, 213 Mo. 517; MacDonald v. Railroad, 219 Mo. 468; De Maet v. Storage Co., 231 Mo. 615. (6) The defendant having demanded the right to perform an autopsy, and having performed same, thereby waived proofs of loss. 14 R. C. L. 1345; 1 C. J. 479, note 85 (d); Fisher v. Ins. Co., 124 Tenn. 450. (7) Defendant having directed plaintiff after the time for furnishing proofs of loss had expired, to prepare and submit same, and plaintiff having gone to the expense and trouble so to do, the defendant thereby waived the defense of failure to present proofs of loss in time. Tinsley v. Mut. L. Ins.

Co., 199 Mo. App. 693; Shearlock v. Mut. L. Ins. Co., 193 Mo. App. 430; Walker v. Knights of Maccabees, 177 Mo. App. 50; Pace v. Insurance Co., 173 Mo. App. 485. (8) It was competent for plaintiff to prove that aside from the accident to the eye, there was no cause for Mr. Wheeler's death at the time he died. 22 C. J. 765; Goodes v. Order U. C. T., 174 Mo. App. 330. (9) The United States Weather Bureau records are competent evidence of the weather conditions. 22 C. J. 801; Moore v. Gans & Sons Co., 113 Mo. 98.

*Jones, Hocker, Sullivan & Angert* for respondent.

(1) A finding that death was the result of a bodily injury effected through accidental means cannot be reached by an inference based upon an inference or by a presumption based upon a presumption. Phillips v. Travelers Ins. Co., 231 S. W. (Mo.) 949; Yarnell v. Ry. Co., 113 Mo. 570, 580; Swearingen v. Railway Co., 221 Mo. 644; Hamilton v. Ry. Co., 250 Mo. 714; Atherton v. Railway Mail Assn., 221 S. W. (Mo. App.) 756; Wright v. Commercial Travelers Assn., 188 Mo. App. 463; Whitesides v. Ry. Co., 186 Mo. App. 608, 619; Keefer v. Pac. Mutual Life Ins. Co., 201 Pa. St. 448; Feder v. Iowa State Traveling Men's Assn., 107 Iowa, 538, 78 N. W. 252; Johnson v. Aetna Life Ins. Co., 101 S. E. 134; National Assn. of Railway Mail Clerks v. Scott, 155 Fed. 92; United States v. Ross, 92 U. S. 281; Globe Indemnity Co. v. Gerish, 163 Ill. 625. (2) No recovery can be had under a policy of accident where under the evidence the insured's death may have been due to two or more causes, for one, and not the other of which, the insurer would be liable. Phillips v. Travelers Insurance Co., 231 S. W. 949; Warner v. St. Louis Railroad Co., 178 Mo. 125, 134; State ex rel. Bush v. Sturgis, 221 S. W. 91; Atherton v. Railway Mail Assn., 221 S. W. 756; General Accident Ins. Co. v. Murray, 90 S. E. (Va.) 620; Transylvania Cas. Co. v. Allen's Admr., 209 S. W. (Ky.) 44. (3) Death from an accidental injury aggravated by a

pre-existing disease, or from a pre-existing disease aggravated by an accidental injury, is not death from accidental means "independently and exclusively of all other causes." Binder v. National Masonic Assn., 127 Iowa, 25; Aetna Life Ins. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523; Stanton v. Travelers Ins. Co., 83 Conn. 708; Thomas v. Fidelity & Casualty Co., 106 Md. 299; Word v. Aetna Life Ins. Co., 85 Neb. 471; Stokley v. Fidelity & Casualty Co., 193 Ala. 90; Western Indemnity Co. v. MacKechnie, 214 S. W. (Tex.) 456; White v. Standard Life & Acc. Ins. Co., 95 Minn. 77; Commercial Travelers Ins. Co. v. Fulton, 79 Fed. 423; Illinois Commercial Travelers Assn. v. Parks, 179 Fed. 794; Aetna Life Ins. Co. v. Ryan, 255 Fed. 483; Postal Clerks Assn. v. Scott, 155 Fed. 92; National Masonic Assn. v. Shyrock, 73 Fed. 755; New Amsterdam Casualty Co. v. Shields, 155 Fed. 54; Maryland Casualty Co. v. Morrow, 213 Fed. 595; Preferred Acc. Ins. Co. v. Patterson, 213 Fed. 595; Crandall v. Continental Cas. Co., 179 Ill. App. 330. (4) No error can be assigned on an excluded question when the record does not show what the answer would have been. Bank v. Aull, 80 Mo. 202; Mfg. Co. v. Railway Co., 230 Mo. 77; Railroad v. Dimmitt, 235 Mo. 492; Holzemer v. Railway Co., 261 Mo. 411. (5) The Marion weather record was offered in the shape of secondary evidence. Blaske v. Wehmeyer, 226 S. W. 868; Keyes v. Munroe, 266 Mo. 114; Nelson v. Jones, 245 Mo. 579; State ex rel. v. Heffernan, 243 Mo. 442.

RAGLAND, J.—This is a suit on a policy of accident insurance, to recover the indemnity therein provided for in case of death.

As applicable to the cause of action pleaded, the insuring clause in the policy reads: "does hereby insure . . . against bodily injury sustained . . . through accidental means and resulting directly, independently and exclusively of all other causes, in death." A subsequent stipulation provides for the indemnity as follows: "if within twenty-six weeks from the date of the

accident . . . the insured suffers death as the direct result of bodily injury, the company will pay the beneficiary five thousand dollars and in addition twenty-five dollars a week for . . . the period between the date of the accident and the date of the death.''

· Albert H. Wheeler was the insured under the policy and the plaintiff, his wife, was the beneficiary named therein. As developed by the trial below, the principal point in dispute was whether the insured's death had resulted from a bodily injury, which he had received through accidental means, within the meaning of the policy provisions. The trial court held that plaintiff's evidence was not sufficient to take her to the jury on this issue, and at the conclusion of her case in chief would have directed a verdict for defendant had she not then taken an involuntary nonsuit. The correctness of that ruling, which involves a review of the evidence, is the matter presented for determination on this appeal.

The case made by plaintiff on the evidence was substantially as follows:

On June 25, 1919, Albert H. Wheeler, the insured, was residing in the city of St. Louis with his wife and son. He was fifty-four years of age, had been a traveling salesman for about twenty-five years and was then so employed. On the evening of the day just mentioned he left St. Louis for a visit to Marion, Kansas, his former home. According to the schedule of trains he was to take *enroute,* he arrived in Kansas City at about seven o'clock the next morning, and after a wait of something like an hour left over another road for his destination, where he arrived at 1:40 p. m. At the time he left St. Louis he was in apparent good health, and had been during the preceding year; and to all appearance his eyes were, and had been, in a normal healthy condition. On the afternoon of his arrival at Marion he visited a local physician who removed from his left eye an angular sharp-edged cinder about the size of a mustard seed. It was embedded in the cornea, and the phy-

298 Mo.—40

sician found it necessary to apply a local anaesthetic and remove it with an "eye spud." There was a marked conjunctivitis of the eye and a local treatment was prescribed.

Wheeler returned to St. Louis about the 18th of July, suffering greatly with his eye. The next day he put himself under the professional care of Dr. Emmett P. North, an occulist. From that time on until his death, which occurred November 4, 1919, his eye was treated daily by Dr. North. The latter found a superficial corneal ulcer in the inner and upper margin of the cornea. During the course of the treatment the ulcer at the initial site healed and others appeared from time to time. As fast as one would heal another would appear. This continued until about three-fourths of the cornea had been involved. At the time of the insured's death, according to Dr. North, the eye was practically healed. The plaintiff testified, however, that from the time her husband returned home until his death, his eye "gradually became worse and more inflamed and discharged. The last day it was very bad." On cross-examination she somewhat qualified this statement by saying that she referred to the apparent conditions of the eye; that Dr. North of course knew the actual conditions much better than she did.

During a considerable period of time immediately preceding November 9, 1917, the precise extent of which is not disclosed by the evidence, the insured was under the treatment of Dr. William Engelbach for syphilis. Immediately upon his return from Kansas he went to Dr. Engelbach, who, after directing him to have Dr. North treat his eye, resumed the treatment for syphilis, which he continued until his patient's death. According to Dr. Engelbach, the disease was at that time in a late secondary or early tertiary stage, but there were no active manifestations of it.

When Wheeler first returned home the latter part of July, his general health as to outward appearance was still good. He weighed at that time 150 or 160 pounds.

During the first part of September he went on one of his regular trips as a salesman, but after having been gone about ten days returned home. He never attempted to go out on the road again. The specific thing from which he was suffering was the affliction of his eye. Gradually he became reduced in flesh; his face grew thin and drawn; he became increasingly nervous and mentally distressed. Notwithstanding, he went down town practically every day—to the offices of his physicians, and to the wholesale house where he remained long enough to make suggestions respecting the details of business matters originating in the territory for which he was salesman. He made these trips in an automobile. Sometimes he drove the car and at others his wife did. On the 4th day of November they went down town together; he parked the car near the entrance of one of the department stores; she got out and went into the store; in about five minutes thereafter she returned and found him sitting in the same position in which she left him, gasping for breath—dying.

An autopsy on the remains disclosed a marked degree of *sclerosis* of the arterial system in the region of the heart, including the *aorta* and coronary artery, the latter being the artery which feeds arterial blood to the heart itself. In the posterior coronary artery there was extensive sclerosis and calcification. At one point in this artery the arterio-sclerotic thickening was such that the passageway for the blood was reduced from a third to a half of its normal size. At this narrowed point a blood clot was found which had entirely closed the artery and thereby shut off the flow of the blood, and this clot or thrombus, in the opinion of all the physicians who testified on the subject, was the immediate cause of death.

With respect to the cause of Wheeler's death, Dr. John L. Tierney testified in part as follows:

"Q. Could the condition of the arteries—in your opinion—could the condition of the arteries, kidney and heart, as outlined in your findings of the *post-mortem,*

could that have caused, in itself, the death of Mr. Wheeler? A. No, sir.

"Q. What was the cause of death; do you know what, from your judgment, was the immediate cause of the death of Mr. Wheeler? A. Thrombosis of the coronary artery.

"Q. How would that cause death? A. The coronary arteries are the vascular supply of the heart muscles; furnish the nutrition and exchange various elements to and from the heart, and when they have ceased to function the nutrition is cut off and thus produces the immediate cause of death.

"Q. Will you explain to us, doctor, just what thrombosis is, what it is composed of and how it is made up? A. Thrombus is an obstructing clot in a vessel. It may be composed of different elements, fibrous, red and white corpuscles, and bacteria, and things of that sort.

"Q. What was this thrombosis? A. That thrombosis, as far as could be determined from the appearance, was an ordinary clot.

"Q. Red or white? A. It was red in color.

"Q. Could a bacteriologist from an examination of this clot determine whether there was bacteria in the clot or not at the time you made your *post-mortem?* A. It would be possible by the strain method—microscopic examination—to determine the presence of bacteria.

"Q. I will ask you, Doctor, taking into consideration the findings that you found in your *post-mortem* and which you read, if Mr. Wheeler had suffered an accident whereby a cinder was lodged in the cornea of the left eye, on or about June 26, 1919; that afterwards, on July 19, 1919, he was treated and found to have an ulcer in the cornea of the eye; that treatments continued on up to November 3, 1919, during which time the ulcer would disappear and reappear in another portion of the cornea until about three-quarters of the cornea was involved; during that time Mr. Wheeler's general health and appearance deteriorated and he was nervous and lost considerable weight, and his face had the appear-

ance of being drawn with pain, could, in your opinion, that injury to the eye have caused the formation of the thrombus and have caused the death of Mr. Wheeler? A. Taking the fundamental principle that the thrombus caused the death; accepting that, you mean?

"Q. Yes. A. I think it is possible that the infection of the eye and the consequent debilitating influences of the infection, and the worry and things of that sort may have contributed; it is possible that they did.

"Q. It could have caused his death? A. The infection of his eye could have been a factor in the thrombosis which caused his death; yes, sir.

"Q. In which way, doctor, could the eye—an ulcer in the eye, form a thrombus in the coronary artery? A. Through the medium of infection, with the implied presence of bacteria.

"Q. What do you mean by 'implied presence?' A. Because bacteria are essential to infection.

"Q. In other words, there would be present, first, bacteria in the blood? A. No; not necessarily in the blood.

"Q. Well, in what? A. At the site of the condition—you mean in the production of a thrombus, yes.

"Q. First, we must assume there was bacteria in the eye? A. Yes, sir.

"Q. All right. And that bacteria must reach the coronary artery; is that correct? A. Yes, sir.

"Q. What is bacteria? A. Bacteria is an unicellular organization itself.

"Q. That is, a substance as distinguished from toxine? A. Toxine is also a substance.

"Q. Isn't toxine a solution? A. It is a substance.

"Q. And bacteria is a substance, as a cinder or as a piece of dirt or grit? A. They are both entities.

"Q. But a toxine is a solution and poison; isn't that correct? A. A toxine is a poison, is the general acceptance. . . .

"Q. Before the eye could in any way contribute or have anything to do with the formation of this thrombus, bacteria from the eye would have to circulate through the system and have reached the artery? A. I will say just the infection, probably, yes, but the eye could contribute in other ways.

"Q. In what other ways? A. Simply by lowering the individual's resistance—the degenerating or debilitating factors that are incident to the affection, such as pain or apprehension and worry. Those things have a debilitating influence and tend to lower the resistance of the individual.

"Q. When you speak of contributing to the formation of this clot, you are taking into account his mental condition as being one of the factors—the worry you have spoken of? A. As intensifying the infection, indirectly, in that the worry produced the clot.

"Q. Besides lowering the resistance in what way could the eye condition have done it? A. We are back now to the infection—the natural infection.

"Q. And before that could have anything to do with this, bacteria, would have to reach the diseased wall, through the circulatory system? A. The bacteria are the—

"Q. Just a minute; could they contribute in any other way without reaching it? A. No; we will grant that the bacteria must reach that point.

"Q. Doing that it has got to circulate all through the system, and through the lungs and through the heart, until it reaches this coronary artery? A. Yes, sir.

"Q. Did you find any evidence of this bacteria in the lungs at the autopsy? A. May I refer to the report? Of course, we wouldn't be able to see the bacteria.

"Q. Did you see any traces of this bacteria through that course, anywhere? A. No; as I recall it there was no evidence of a bacterial nature in the lung.

"Q. There was none in the heart, was there? A. Or the coronary artery.

"Q. Well, Doctor, this whole course, the bacteria you found no evidence of it being present? A. No, sir.

"Q. That is correct? A. Yes, sir.

"Q. The coronary artery was considerably diseased; isn't that correct? A. Yes, sir.

"Q. And by that we mean there was present arterio-sclerosis? A. There were changes in the wall of the coronary artery.

"Q. You mean a deposit of calcium salts on the internal wall and a disease of the wall; that is correct? A. Yes, sir.

"Q. The diameter of the wall was narrowed about one-half of its normal width? A. One-third to one-half.

"Q. And what was the length of the diseased part of the wall? A. I will have to refer—I don't recall the figures.

"Q. Refer to your memorandum, please. A. I don't know whether it is—it says: 'Posterior coronary artery shows extensive arterio-sclerosis from one-half to three-quarters inches from mouth, one patch three-eighths of an inch in length.'

"Q. Right in this diseased wall or narrowed wall you found this thrombus? A. Yes, sir.

"Q. And the thrombus in this instance was a red-blood clot? A. Yes, sir; a red clot.

"Q. With that diseased condition, aren't the prime factors for the formation of a thrombus, first, a diseased wall, arterio-sclerosis; second, slowing up of the blood, caused by this narrow passage at that point; third, an eddying of the blood at that point of entrance into or through the diseased wall? Aren't those, as given by all medical authorities, the prime factors for the formation of a thrombus, such as you found in this case? A. The three points you mention are all contributing factors; yes.

"Q. Well, aren't they sufficient, of themselves, to form a thrombus such as you found with the conditions being as you found them? A. It is possible; yes.

"Q. It is possible, then, for this thrombus to have been formed and caused by the diseased condition of the wall, and naturally the slowing up and eddying of the blood, independent of any bacteria in the blood? A. It is a possibility.

"Q. You found no bacteria there in the blood, anywhere, did you? .A. How do you mean, found it?

"Q. I say, you found no bacteria? A. You can't see bacteria.

"Q. You made no examination to determine it? A. No; those examinations were not in my hands.

"Q. It is just as possible that this thrombus was formed, or caused to be formed, from the diseased wall, and these three prime factors that I have mentioned, all of which existed, as from any bacteria from any part of the body—just as possible? Isn't that just as possible, Doctor—we are dealing in possibilities? A. We are dealing in possibilities; yes.

"Q. Isn't it just as possible and just as probable? A. I would have to distinguish that to give it a proper answer. May I illustrate in order to elucidate?

"Q. Answer the question and then explain. Isn't it just as probable? A. No, sir. . . .

"Q. Assuming that Mr. Wheeler had syphilis and had it for a long time, in your opinion, then, that was the cause of the formation of this—I mean the diseased condition of the artery—arterio-sclerosis? A. I think that is possible.

"Q. That is the usual cause of it? A. In the presence of known infection it is logical to presume it to be a contributing factor.

"Q. Isn't syphilis a disease of the blood? A. It is commonly accepted as a disease of the blood; yes, sir.

"Q. Well, now, isn't it an infection of the blood at times? A. Yes, at times the infection is in the blood.

"Q. Well, it is also along the line of your reasoning, then, in that bacteria might have come from the eye to the coronary artery, this bacteria from syphilis might

have produced the same result? A. The organism of syphilis is not bacteria.

"Q. It is a disease of the blood, isn't it? A. It is a disease of the blood.

"Q. That can form or contribute to the formation of a thrombosis, can it not? A. The organism of syphilis and the organism of ordinary infection are much different, and are two totally different types.

"Q. Either may be a nucleus or a thrombus? A. They are not comparable, because the organism of syphilis is not an infection in the sense that it produces pus or the ordinary result of infection. It is a different sort of thing.

"Q. Isn't the disease in the blood from syphilis, a toxine? A. At some time in the course of the disease, the infection and organism is in the blood.

"Q. And you can't say they didn't exist at that time? A. It is not at all probable.

"Q. You can't say that they didn't exist at that time? A. I could say with reasonable certainty that they were not in the free circulation of the blood; yes.

"Q. Well, if this syphilitic condition was not active, but a condition of long standing or possibly an inherited condition, would there have been any bacteria from the syphilitic condition, in the blood? A. There might be, yes; but the likelihood that they are present is not as great as it would be in the earlier stages in the acute.

"Q. This condition—this sclerotic condition of the arteries—could you tell if that was a new development or was it a matter of long standing? A. It was probably a matter of some time, chronic process, very likely it was; I mean a slow developing thing, extending over the course of a number of years.

"Q. Before the bacteria from the eye could get in the circulatory system, what would it have to go through? A. It would have to go through—coming from the eye it would have to come through certain small spaces analogous to the lymph spaces in the perineurium sheath,

in the lymph spaces, and down various routes into the lungs, and from the lungs back into the heart and from the heart into the vessels and out in the general circulation.''

Dr. William Engelbach, in answer to substantially the same hypothetical questions propounded to Dr. Tierney, said: ''My opinion is that the injury contributed to his death.'' He further testified:

''Q. What do you mean by that, doctor? A. That it was one of the active factors in producing his death— the injury to the eye you are speaking of.

''Q. What do you mean when you answer my question, that this condition could have caused the death? A. Well, I mean the infection in the eye, and the secondary effect of that, consequent to it, could have been a factor in the production of the thrombosis, the formation of the thrombosis, which was the cause of death.

''Q. These thrombuses—is that what you call them? A. Yes, sir.

''Q. They are produced oftentimes by the disturbance of the current of the blood as it flows through these areas—these impeded areas, are they not? A. Sometimes; that is one factor in their production—sometimes.

''Q. Well, I say those may be—it may be a factor? A. It may be; yes, sir.

''Q. Where these—at the place where these—where the sclerosis begins and where the narrowing of the arteries begin, there is a sort of an eddying of the blood there, isn't there; as the blood runs up and finds its passage interfered with and restricted, there is an eddying of the blood there, isn't there? A. Sometimes; yes, sir.

''Q. That is there all the time where you have that condition? A. Well, no; not all the time; it all depends a great deal on the size of the artery.

''Q. Where it is restricted; where the coronary artery is restricted to one-half its size, and you have the reduction from that one place, for the normal size

to half the size and the blood comes up against that obstruction, it creates an eddying and flurrying in the blood as it strikes? A. Yes, sir.

"Q. And that tends to a coagulation of the blood, doesn't it? A. It might.

"Q. And this coagulation of the blood is really a blood clot, isn't it? A. Yes, sir.

"Q. And the blood clot is a thrombus, which is deposited at this particular place or becomes attached to this particular place, and interferes or stops the flow of blood at that point, and in the case of an important artery like the coronary artery, death results, doesn't it? A. That might be possible; yes, sir.

"Q. Isn't that the usual cause of it? A. Well, no; I don't think the narrowing itself is the usual cause.

"Q. But it is the obstruction to the flow of the blood that causes the death? A. Yes, sir; but the obstruction, itself, may not produce the thrombus, itself.

"Q. It usually does, though, doesn't it? A. It may be one factor that helps produce it, but not alone.

"Q. But it usually does, doesn't it? A. With other factors working and operating.

"Q. Other factors are not necessary to the result are they, they may accomplish it, but they are not necessary in the result of it, are they, Doctor? A. Yes, they usually are.

"Q. They usually are? A. Yes, sir.

"Q. What other factors than those are necessary? A. Well, we have thrombosis without any obstruction in the blood or any of the vessels or change in the vessel wall—

"Q. You may have thrombosis without any disturbance of the vessel walls, then? A. Yes, sir.

"Q. And when you have that it is due to some other cause than the condition of the wall; but in the great majority of the cases are not these thrombuses the result, are not they accompanied by the arterio-sclerotic condition that existed there in connection with it? A. No, I

wouldn't say that; we have many thrombuses without arterio-sclerosis.

"Q. I say the greater number of them are accompanied by that? A. No; when you consider the great number of thrombuses that we have, I wouldn't say the great majority have arterio-sclerosis associated with it.

"Q. The thrombosis may result from a deposit being detached from the wall of the artery and becoming the nucleus of thrombus, may it not? A. Yes, sir.

"Q. And you may have, as you have described, some bacteria forming the nucleus? A. Yes, sir; an infection of the blood stream; may be toxaemia.

"Q. Will you distinguish between toxaemia and bacteria? A. Well, bacteria are live properties, where toxines are the production of parasites and disease germs, so to speak.

"Q. Now, these toxines or bacteria, how do they get into the blood; what is your idea of that? A. Well, they get in through some atrium, or get into the blood or lymph stream through some connection, or outside opening into the vessels. . . .

"Q. How would the bacteria from the cornea of the eye reach the coronary artery; could you describe the course it follows so that I or the jury might understand; how would it arrive at this spot? A. Well, it would get into the lymph spaces of the cornea—

"Q. What do you mean by the lymph spaces? A. They are the spaces between these cells, around the edge of the cornea, and in an infected cornea or infected area, like this patient had, that had the infection almost directly in contact with the blood vessels.

"Q. Almost in direct contact? A. Yes, sir; as close as they could be in any other tissue.

"Q. As I understand you, bacteria is one of the causes of thrombosis, one of many? A. Yes, sir.

"Q. There are many causes of thrombosis, aren't there? A. Not so very many—a number of different bacteria.

"Q. As I understand you, according to your science, one of them may be produced by the eddying of the blood and the resultant coagulation of the blood through contact with the restricted areas in the sclerotic part of the artery? A. Yes, sir.

"Q. And you may have thrombosis from a substance which is separated from the walls of the arteries themselves where they are in a diseased condition, which may produce them? A. Yes, sir.

"Q. And you may have a condition which is in the blood, itself, may you not; some diseased condition that exists in the blood, itself? A. Without any change in the vascular system, itself.

"Q. And the purely diseased condition of the blood vessels themselves—of the blood, itself? A. Yes, sir; of the blood, too.

"Q. The blood is composed of these two corpuscles? A. Yes, sir.

"Q. The red and white? A. Yes, sir.

"Q. And the disease of them may produce that result, may they not? A. Yes, sir.

"Q. Or one or both of them, and then again you may have poison—what was the word—toxaemia in the blood itself, that may produce it, and active, live bacteria in the blood, itself, may produce that? A. Yes, sir."

Both physicians admitted that they had never before observed, heard or read of a case in which an injury to the eye, such as the insured suffered, was thought to have been a factor in the formation of a thrombus.

Dr. North testified that it would be more difficult to effect the cure of an injury where the person was affected with a disease of the blood like syphilis than it would be if he were in normal health. With respect to the presence of bacteria at the site of the injury, he said:

"Q. Doctor, as I understand you, there were some secretions, but whether they were pus secretions you were not able to say? A. There are always germs with-

in the conjunctiva sac within the lids, within the. outer protecting membranes of the eyeball. There are always germs there. You can always count on having pus, at least when the trouble had gone as long as this had.

"Q. You didn't make any examination then to verify whether these secretions were pus or not? A. No, sir.

"Q. You are simply reasoning from your general experience? A. Yes, sir.

"Q. There are germs under the eyelids and may be on all exposed portions of the body? A. Yes, sir.

"Q. And these secretions may have become impregnated with these germs? A. Yes, sir.

"Q. And those germs would move out with the secretions, wouldn't they—be washed out with the secretions? A. Yes.

"Q. That would be the usual experience, wouldn't it? A. As a rule; yes, sir."

None of the physicians present at the autopsy was able to tell whether the thrombus was attached to the wall of the artery, and there was no evidence as to the component elements of the clot.

I. In upholding the ruling of the trial court, respondent (defendant) contends: first, the evidence was not sufficient to support a finding that the injury to insured's eye was the cause of his death; and, second, the evidence affirmatively shows that in any event such injury was not the direct cause of death, independently and exclusively of all other causes.

*Sufficient Evidence: Chain of Causation.*

As to the first contention respondent's argument is this: The evidence shows that there were three possible causes of the blood clot which was the immediate cause of death: (1) Infection from the eye might have found its way into the vascular system, thence through the lungs and heart into the arterial system; (2) the eddying and churning of the blood against the diseased

arterial wall, due to the necessary slowing up of the current at the entry to the narrowed passageway, may have caused coagulation; and (3) a particle of the calcification, set up by the syphilitic infection on the inner arterial wall, may have broken off and become the nucleus around which the clot formed. And the evidence leaves it wholly to conjecture as to which of the three causes actually operated to produce the thrombus. The conclusion that infection from the eye was the cause cannot be reached without piling inference upon inference. The evidence goes no further than to show infection (bacteria) at the site of the injury; it must then be inferred that the bacteria or their toxines entered into the circulatory system, and from this inference the further inference must be drawn that they actually caused the formation of the blood clot. The necessity of basing the inference last mentioned on the one preceding is a fatal hiatus in the evidence relied upon to establish the chain of causation.

The testimony of the two physicians who gave evidence on the subject may be summarized as follows: A blood clot, which is but a coagulation of the blood, may be caused solely by the eddying of the blood when forced through a constricted part of an artery, or it may be caused by a particle of the calcareous deposit on the wall of a diseased artery detaching itself and entering the blood stream, but the formation of a clot from these causes alone is unusual. The usual cause is an impaired condition of the blood resulting from the presence of bacteria or their toxines in the blood itself. Thrombi are caused by this condition of the blood when the arteries are perfectly normal; diseased arterial walls, however, tend to facilitate their formation. It is therefore probable that the thrombus which caused the death of the insured was in turn caused by bacteria or toxines. Deceased had been afflicted with syphilis, and it had reached the tertiary stage. While it is possible that at that stage of the disease for its infection and organisms

to be in the free circulation of the blood, it is not at all probable. It is highly probable, therefore, that the thrombus which effected the death in this case was caused by the infection from the eye.

It is true that a mere probability is not proof, and that the sum of two such probabilities is only a probability. [Day v. Railroad, 96 Mo. 207.] But it would not have been necessary, under the evidence, for a finding that the insured's death was caused by the injury to his eye to have rested upon a mere probability. The evidence shows without conflict that immediately prior to the injury he was actively engaged in his vocation as a traveling salesman, and his health to all outward appearance perfect; immediately following the injury a most virulent infection set up in the eye; ulcer followed ulcer for a period of more than three months; during that period his appearance gradually changed, he became greatly reduced in flesh, he became increasingly nervous and his face grew thin and drawn; these conditions progressed relentlessly until he died. The only outward and visible cause of this sudden decline from normal health to feebleness and death was the injury to the eye. Nor does the testimony of the physician disclose any other. According to that there were no active manifestations of syphilis during any of the time. On this evidence dealing only with the tangible external facts and conditions that followed in an unbroken chain of sequence from the initial injury of the insured to his death, there being no other facts or circumstances reasonably accounting for his death, a jury would be justified in finding that the injury was the cause of his death. [DeMaet v. Storage Co., 231 Mo. 615; MacDonald v. Railroad, 219 Mo. 468; Sharp v. Railroad, 213 Mo. 517.] The medical testimony would not only be in harmony with such finding, but would fortify it in showing the great probability of the existence of the fact so found.

II. One of the physicians gave it as his opinion that the injury to the eye of the insured was one of the ac-

tive factors in producing his death; the other said that
the infection of the eye could have been
a factor in the thrombus which caused his
death. On these opinions of the experts,
in connection with the evidence as to the
diseased conditions of the arteries resulting from the
pre-existing syphilitic affection, respondent bases its
contention that the evidence shows that the injury to
the eye, if a factor at all in the death of the insured,
was but a contributing cause and not the direct cause
"independently and exclusively of all other causes."

*Proximate Cause: Concurring Agency.*

The carefully qualified deductions drawn by the two
physicians from the facts assumed in the hypothetical
questions should be considered in the light of their tes-
timony as a whole. One of them testified that there were
no active manifestations of syphilis; the other said that
in his opinion the condition of the arteries could not, in
itself, have caused death. It is clear that both were of
the opinion that the disease of syphilis was not an ac-
tive agent in bringing about Wheeler's death. The only
influence that it had therein was with respect to the con-
ditions it had established in his body prior to the injury
to his eye. By reason of that condition it was more dif-
ficult to effect a cure of the eye; and much easier for
the infection originating in it to cause the formation of
a thrombus.

There seem to be two divergent lines of decision in
the interpretation of the various terms employed in
policies of the character of the one in suit by way of
limiting the cause or causes of death for which indem-
nity is provided, the divergence arising apparently over
the question of whether the general rule of proximate
cause is applicable and controlling. Appellant cites the
cases that tend to support the view that that rule is
the ultimate test of liability under such policies, while
respondent urges a consideration of those appearing to
oppose it. An analysis of the cases will, we think, dis-
close an apparent rather than a real conflict. Some of

the decisions are made to turn upon the particular wording of the contract involved; others upon a peculiar state of facts. It would be an endless task, however, to undertake the distinctions that would tend to bring them into harmony. It is sufficient for our purpose to say that the facts of the instant case clearly bring it within the rule of decision applied in Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 268: "An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different." In Driskell v. Insurance Company, 117 Mo. App. 362, 369, it is said: "If, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury." That is a very lucid statement of the underlying principles involved, and their application to the facts of this case is manifest. [Casualty Co. v. Lloyd, 165 Ind. 52; Thornton v. Ins. Co., 116 Ga. 121, 129; Modern Woodmen Acc. Assn. v. Shryock, 54 Neb. 250; Freeman v. Mercantile Acc. Assn., 156 Mass. 351; Lawrence v. Accident Ins. Co., 7 Q. B. D. 216.]

When we speak of "the facts of this case," we mean of course the facts which plaintiff's evidence reasonably tended to establish. That evidence, for the reasons we have endeavored to point out, was sufficient to warrant a finding by a jury that the death of the insured re-

sulted directly, independently and· exclusively of all other causes, from the injury to his eye—which it is conceded was sustained through accidental means.

III. This question was asked Dr. Engelbach: "Aside from the injury to the eye, in your opinion were there sufficient findings in the *post-mortem* of organic condition as to his heart and arteries ·and kidneys, which could have caused the death of Mr. Wheeler?"
**Proof of Negative.** He was not permitted to answer, on the ground that plaintiff was undertaking to prove a negative. Further along in the examination, after the witness had testified that in his opinion infection in the eye could have been a factor in the production of the thrombus, he was asked: "What other findings did you find from your *post-mortem,* aside from the condition of the eye, that could have caused the formation of this thrombus and caused his death?" The same objection was sustained to this question as to the previous one.. These questions called for testimony that was clearly relevant, and if they had elicited negative evidence, as it was assumed they would do, such evidence would not have been inadmissible merely because negative in character. [10 R. C. L. 928.]

IV. Plaintiff offered in evidence a record kept by the United States Weather Bureau at Kansas City to prove the temperature at Marion, Kansas, on June 26, 1919. Upon defendant's objection the record
**Weather Bureau Reports.** was excluded as hearsay. It appeared that observations made at the various points in Kansas where the Government had established recording stations were forwarded at the end of each month to an official of the bureau at Topeka; this official systemized and tabulated the data ·contained in the reports and sent them on to the office at Kansas City where they were further arranged and put into final form for publication. In this form they were printed for general distribution, and in this form, as printed, they are kept

as the records of the United States Weather Bureau at Kansas City. Such a record is competent evidence of the facts stated in it, according to the great weight of authority. The applicatory rule is stated by Corpus Juris as follows:

"A record or document kept or prepared by a person whose public duty it is to record truly the facts stated therein, is, when relevant, admissible as prima-facie evidence of such facts, although the statements therein were made extrajudicially by a person not under oath and not subject to cross-examination, and the person who made the record may have had no personal knowledge of the matter recited, provided that it was made originally with the intent that it should be kept as a memorial to be referred to and used as evidence." [22 C. J. 801.]

This was the substance of our holding in Priddy v. Boice, 201 Mo. 309, 334, in ruling on the admissibility of copies of the United States Census reports.

The plaintiff did not furnish defendant with proofs of death within the time stipulated in the policy, but she offered evidence tending to show a waiver of that provision. Appellant has briefed the question here, but as respondent has wholly ignored that phase of the case we conclude that it does not seriously contend that the waiver was not established, at least prima-facie.

Because of the erroneous ruling, that defendant at the close of plaintiff's case in chief was entitled to a directed verdict, the judgment is reversed and the cause remanded. All concur.