W. H. HURLEY, ET AL., APPELLANTS, v. ILLINOIS CENTRAL RAILROAD COMPANY, RESPONDENT.*

Kansas City Court of Appeals. April 5, 1926.

480

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 1016, n. 47; p. 1033, n. 37; Carriers, 10CJ, p. 108, n. 82; p. 114, n. 42; p. 122, n. 25, 35; p. 373, n. 95; p. 391, n. 29; p. 402, n. 56; Damages, 17CJ, p. 770, n. 34; p. 776, n. 56; p. 1025, n. 62; Evidence, 22CJ, p. 526, n. 11; p. 805, n. 47; 23CJ, p. 38, n. 35; p. 140, n. 98; p. 142, n. 10; Trial, 38Cyc, p. 1517, n. 61.

*Kenneth W. Tapp* and *Omar E. Robinson* for appellant.

*Lathrop, Morrow, Fox & Moore, Winston H. Woodson* and *William M. Anderson* for respondents.

BLAND, J.—This is an action against a common carrier for damages to two carloads of corn occurring while they were en route from Council Bluffs, Iowa, to Clinton, Missouri. There was a verdict and judgment in favor of the defendant and plaintiffs have appealed.

Plaintiffs alleged general negligence, pleading a case under the insurer theory of liability on the part of defendant, but at the trial assumed the burden of proving specific negligence. Plaintiffs' evidence tended to show that on July 24, 1920, the defendant issued its bills of lading on the cars in question and that the shipment left Council Bluffs on that day, arriving at Clinton on July 30th. When the cars arrived at the latter point plaintiff found the corn to be hot, sour, mouldy, musty and in a damaged condition. Upon going into the cars plaintiffs and their agents discovered that there were cracks in the sides of the cars, about one-sixteenth of an inch wide, through which could be seen daylight. Stains were found on the inside walls of the cars, indicating that water had come through the cracks into the car. One of these witnesses found that the "corn was sticking to the insides of the cars at the grain line down about two or three inches." The corn was encased and hot from top to bottom; it had a foul, musty and objectionable odor. When tested the corn graded sample mixed corn, meaning no commercial grade. Plaintiffs called the chief Grain Inspector of the State Grain Department

at Kansas City, asking for an inspection of the cars. An agent of this department came to Clinton and on the morning of July 31st took a sample of the corn which was afterwards tested at Kansas City. After the sample was taken, plaintiffs' agents procured an ordinary garden hose without a nozzle and ran water on the tops and sides of the cars for five or ten minutes. There was no leakage in the top of the cars but the water ran through the cracks on the sides.

The corn was purchased as No. 2 corn and was inspected by the Federal Government at Omaha, Nebraska, on July 23rd and graded No. 2 mixed; one car weighed 55.3 pounds per bushel, moisture content 14 per cent, total damaged 3.8 per cent, heat damage 0.1 per cent, foreign material and cracked corn 2.4 per cent; the other car weighed 55.3 pounds per bushel, moisture content 14 per cent, total damaged 4 per cent, heat damage 0.1 per cent, foreign material and cracked corn 1.3 per cent. The sample taken from the first car at Clinton graded sample mixed, weight 54.8 pounds per bushel, moisture content 14.2 per cent, foreign material and cracked corn 1.5 per cent, and graded "hot." The sample from the other car graded sample mixed, weight 55.1 pounds per bushel, 14.2 per cent moisture content, foreign material and cracked corn 1.5 per cent and graded "hot." At Council Bluffs each car weighed 80,000 pounds; at Clinton one car weighed 79,290 pounds and the other 79,210 pounds.

There was evidence tending to show that corn in the condition shown by the inspection at Omaha would not heat and deteriorate in transit unless moisture entered the car from an outside source. Plaintiffs' evidence further tended to show that "a very little moisture, outside moisture, will start corn fermenting and by capillary attraction carries a damage to the balance of the grain in the car, it creates an acid which starts fermentation and the fermentation starts decay;" that the moisture that is found in corn upon inspection by the State or Federal authorities is "part of the grain itself," but that the moisture that causes corn to spoil is "outside moisture;" that the fact that the corn weighed somewhat less in Clinton than it did at Council Bluffs was caused by shrinkage due to deterioration.

The corn when it arrived at Clinton was not wholly without food value. One car was unloaded by plaintiffs on August 2nd, the other on the following day. Plaintiffs' evidence tended to show that the causes of the delay in unloading the cars were two; first, they were attempting to get the terminal carrier to take the corn off their hands, and, second, they were trying to find a market for that quality of corn. The court on motion by defendant struck out the testimony in relation to the first reason assigned, upon objection being made that there was no duty upon that company to take over the corn.

The corn was of such a low quality that it was not merchantable, corn of that grade having no market value. It was taken in plaintiffs' elevator and there dried. It could not be sold even when dried

so plaintiffs mixed it with high grade corn and finally sold it, piecemeal, at $1 a bushel as No. 3 corn. Had the corn arrived at Clinton in the condition that it was in when it left Council Bluffs, it would have been worth $1.50 per bushel at the former place.

Defendant put upon the stand a representative from the U. S. Weather Bureau in Kansas City, who testified from weather reports maintained by the government as to the rain fall and temperature at eight different points along the route that the corn took in transit. There was no rain at any of these points during the time that the corn was en route except at Omaha where there was .64 of an inch of rain on July 25th. However, this rain was distributed over the entire day and did not amount to more than a good sprinkle except between the hours of nine and ten of that morning when the rain fall was .15 of an inch. The greatest wind velocity at any time during that day was at 1:42 P. M. when it was ten miles per hour. However, the witness from the Weather Bureau testified that it could not be ascertained from the government weather reports whether it was raining between these various government stations during the times that the weather conditions were observed at the stations; that local showers would come up, especially during the summer season. If necessary, we might take judicial notice of these peculiarities of rain.

Defendant also had testimony tending to show that the amount of cracked corn and foreign material in the corn, as shown by the inspection at Omaha, was nearly the limit of No. 2 corn and that these materials caused the damage to the corn; that if any moisture had entered the corn from the outside, the inspection at Kansas City would have shown a higher percentage of moisture and that a carload of wet corn will weigh more than one of dry corn.

Complaint is made of defendant's instruction No. 3, which reads as follows:

"The court instructs the jury that it was the duty of the plaintiffs to receive the cars and to unload them within a reasonable time and to dispose of the corn without delay and to the best advantage in order to prevent further deterioration in the corn, and to lessen the damage and loss, if any, and in this connection you are instructed that if you find and believe from the evidence that the plaintiffs failed and neglected to unload the cars and dispose of the corn within a reasonable time and to the best advantage, then and in that event, plaintiffs are not entitled to recover."

This instruction was undoubtedly erroneous. There is no question but that plaintiffs were required to exercise reasonable care and diligence to avoid further loss to the corn, and they cannot recover that part of the damage, if any, that resulted from their failure to exercise such care and diligence. [8 R. C. L., pp. 442-444, 450.] But it is apparent that even if plaintiffs did not unload the corn within

a reasonable time and dispose of it to the best advantage, resulting in additional damage, plaintiffs were not precluded from recovering that part of the damage to the corn due to the negligence of the defendant and its connecting carriers.

However, defendant insists that there was no evidence of the value of the corn at the time it arrived at Clinton and was delivered to the plaintiffs. It is claimed that plaintiffs' testimony on this subject was so indefinite as to amount to no more than mere speculation as to such value and, consequently, the jury had no evidence on which to determine that part of the damages caused by the negligence of the defendant. It is claimed that the duty was upon plaintiffs to show the value of the corn when it arrived at Clinton; that if there was further deterioration between the time the corn arrived at Clinton and the time it was unloaded, the price that plaintiffs obtained from the corn would not furnish any basis whatever upon which the jury could determine the damages. The following authorities demonstrate the fallacy of this reasoning:

"If the plaintiff showed negligence on the part of the defendant, he was prima-facie entitled to recover all of the damages sustained, and the burden of proof rested upon the defendant to prove the negligence by which plaintiff enhanced the amount of the damage or failed to prevent the injury, as well as the extent to which such damages were enhanced or to which they might have been lessened by the use of ordinary care on the part of the plaintiff." [Belcher v. M. K. & T. Ry. Co., 92 Texas, 593, 597.] [See, also, 3 Southerland on Damages (4 Ed.), p. 3405, and Winne v. Railroad, 31 Iowa, 583, 587, 588.]

Complaint is made of defendant's instruction No. 5, which reads as follows:

"The court instructs the jury that in the transportation of grain, the defendant is not an insurer and is not responsible for damages due to or flowing from the inherent condition of the grain. You are, therefore, instructed that if you find and believe from the evidence in the case that the damage to the grain, if any, resulted from the inherent defective condition of the grain, if any, then your verdict must be for the defendant."

This instruction was undoubtedly erroneous. The carrier is an insurer of perishable.goods except as to damages caused solely from the act of God, the public enemy, or the inherent infirmity in the goods. [Fruit & Nut Co. v. Railroad, 163 Mo. App. 426, 437; Singer v. American Express Co., 219 S. W. 662, 664.] Of course, the carrier is not an insurer against damages caused by the carelessness of the shipper. While the instruction taken as a whole might not be misconstrued by the jury, the language used in reference to defendant's not being an insurer of the grain is technically wrong, it leaves room for a

possible misunderstanding on the part of the jury and the instruction should not be given on another trial. But the instruction is positively erroneous for another reason. If the inherent infirmity of the grain combined with the negligence of the defendant to cause the loss, then defendant is liable. [Fruit & Nut Co. v. Railroad, supra.] The instruction wholly ignores this rule.

Complaint is made of defendant's instruction No. 4, reading as follows:

"The court instructs the jury that you cannot base your verdict in this case on speculation, conjecture or guess. If your are unable under the evidence to determine with reasonable certainty whether the damage, if any, to the corn shipped in this case was due to the failure of defendant, if any, or due to the condition of the corn, causing it to deteriorate and decay, then your verdict must be for the defendant."

It is insisted that the use of the words "with reasonable certainty" is erroneous because plaintiffs were required to prove their case only by the preponderance of the creditable evidence in the case. As before stated, plaintiffs assumed the burden of showing negligence on the part of the defendant and now seem to concede that it was their duty to show such negligence. Under the petition plaintiffs could have relied upon the insurer doctrine and made out a prima-facie case by proving delivery of the corn to the carrier in good condition and delivery by the carrier in bad condition. The burden then would have been cast upon the carrier to show that the loss or injury was caused in some manner that exonerated the carrier from liability. [Morrow v. Wabash, 276 S. W. 1030, 1032; Hartford Fire Ins. Co. v. Payne, 243 S. W. 357, 359.] And under such circumstances if the jury is unable to determine whether the damage was due to the negligence of the defendant or the inherent condition of the goods, the jury should find for the plaintiffs. However, if at another trial plaintiffs continue to try their case upon the theory that the burden was upon them to show negligence, the question as to the propriety of the words complained of can be met by the use of the words "to your reasonable satisfaction" instead of "with reasonable certainty." [Nomath Hotel Co. v. Kansas City Gas Co., 253 S. W. 975, 981.] As defendant is claiming that there is no difference between the use of the two terms, it will have no objection to changing this instruction in the manner we have indicated.

Plaintiffs complain of the action of the court in giving defendant's instruction No. 2, telling the jury that they should not be governed by sympathy, passion or prejudice. While there may not have been any exceptional circumstance in the case calling for such an instruction, no case has been reversed for the giving of it. [Aronovitz v. Arky, 219 S. W. 620, 624.]

Plaintiffs insist that the testimony of defendant in reference to the rainfall and temperature at the various stations was incompetent because the government reports were mere hearsay. The testimony shows that these reports were compiled and kept substantially as were the reports in the case of Wheeler v. Fidelity & Casualty Co., 251 S. W. 924, 931. In that case the Supreme Court held the testimony competent. Objection is made to the expert testimony of defendant's witness Gray, for the reason that it is claimed that he did not qualify as an expert on the question as to what might have caused the condition of the corn. The evidence shows that this witness not only had made a study of grain, such as corn, but had considerable experience in the handling of it. We cannot say that the trial court abused its discretion in allowing him to testify as an expert. [Adams v. Railroad, 229 S. W. 790.] Complaint is made of the exclusion of certain testimony of plaintiff Hurley. We find that upon an examination of the record the witness testified at other times substantially as it was sought to have him testify when the court sustained the objections.

From what we have said there is no question but that the judgment should be reversed and the cause remanded, but defendant insists that the verdict was for the right party and therefore it should be affirmed regardless of any possible error in the trial. Of course, under the evidence, we cannot say as a matter of law that defendant was entitled to the verdict. In arguing this point defendant relies partly upon the fact that only one witness for plaintiffs stated that the cracks in the side of the cars were large enough to be seen by the naked eye and that daylight could be seen through the holes, while a number of plaintiffs' witnesses were in the car and could have seen what this witness saw. This was, of course, a matter for the jury and this would be so even if the other witnesses had testified as a matter of fact that they could not see daylight. [Frankel v. Hudson, 271 Mo. 495.]

It is also insisted that the playing of the water on the sides of the car was not a fair test. Of course, there was other testimony tending to show that defendant and its connecting carriers permitted water to get into the car without this evidence. There was testimony, as before stated, tending to show that there were cracks in the sides of the car and stains indicating that water had entered the car; corn adhered to the sides of the car. In addition to this there was evidence that the car could not have been in the condition that it was found to be in when it arrived at Clinton if outside moisture had not been permitted to get into the car. The jury was at liberty to give what weight it saw fit to the test made by running water over the sides of the cars through the hose.

While the testimony of the employee of the Weather Department was not contradicted, it was not conclusive. The car could have

been rained on while in transit notwithstanding the fact there was no rain at the various stations during the time that the car was in transit. The evidence shows there was .64 of an inch of rain at Omaha on the day the car left there and .15 of this rain fell between 9:00 and 10:00 A. M. of July 25. The car arrived at Omaha from Council Bluffs, which is located merely across the river from Omaha, at 10:00 A. M. We cannot say as a matter of law that this was not a sufficient amount of rain to have penetrated the cars in the condition that they were in. Of course, the presence of some wind would have been necessary in order for rain to have entered from the sides of the cars. There is no evidence that there was no wind present at that time. The evidence merely being that the maximum wind on that day was ten miles an hour at 1:42 P. M. Of course, the amount of wind, even though small or non-existent at the point where the observation was made, would not necessarily show that there was not a greater amount of air stirring around box cars sitting in a railroad yard. It is a matter of common knowledge that air currents are often caused by a great many local conditions, such as the presence of buildings and other objects.

Stress is laid upon the testimony that the corn was equally bad in both cars. Defendant infers from this that the corn deteriorated because of its inherent condition. The evidence was that the defects in both cars were substantially the same. The fact that the report of the inspection of the corn at Omaha and the one made at Kansas City were practically the same outside of the grades and notation that at Clinton the corn was hot, especially the report that the moisture content of the corn was practically the same, has been already explained as well as the fact that the corn weighed less at Clinton than at Council Bluffs. There was testimony that the reference to the moisture content in State and Federal inspections, means moisture inherent in the corn itself and not moisture from an outside source. There was testimony that the corn might weigh less after having deteriorated as this corn had.

The judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.