MABEL FLOYD, RESPONDENT, v. A. Y. McDONALD MFG. CO., EMPLOYER AMERICAN MUTUAL LIABILITY INSURANCE CO., INSURER, APPELLANT.*—46 S. W. (2d) 251.

Kansas City Court of Appeals.   February 1, 1932.

*John C. Nipp, Mont T. Prewitt* and *E. E. Thompson* for respondent.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau* for appellant.

BLAND, J.—This is an appeal from a judgment of the Circuit Court, affirming an award of the Compensation Commission. Claimant is the wife of deceased, who, it is claimed, received an injury, on or about February 27th or 28th, 1930, arising out of and in the course of his employment with the defendant, McDonald Manufacturing Company.

The final award made by the Commission was for $8 for medical aid, $150 for burial expenses. It also awarded claimant, for death benefits, the sum of $19.60 for 300 weeks, "or until her prior death or remarriage and the unpaid balance to Carl P. Floyd, minor son of deceased, as his interest may appear."

The Circuit Court affirmed the award of the Commission for the total sum of $6,038, together with interest at the rate of six per cent per annum, from August 11, 1930, the date of the final award of the Commission.

It was the contention of the claimant before the Commission that deceased died by reason of having received an abrasion or open wound on the outside of his left leg immediately below the knee; that strepococci germs entered through the wound causing a septic infection or blood poisoning, from which employee died on March 12, 1930. The Commission found the facts to be as claimed by claimant.

It is defendants' contention here that the finding that the employee was injured in the course of his employment is based upon hearsay and, therefore, that there is not sufficient competent evidence to establish that the injury, which it is contended he received at that time, resulted in his death. All of the testimony was adduced by plaintiff. There was none on the part of defendants.

The evidence shows that sometime prior to the date upon which it is claimed deceased received the injury aforementioned, and on said day, he had been and was in the employ of the defendant, A. Y. McDonald Manufacturing Company, as a janitor and night-watchman at its place of business in Kansas City. In going about the premises he would use an elevator therein in the discharge of his duties. The elevator in question had no doors but the elevator shaft had gates at each floor. These gates were raised by the operator of the elevator in alighting from it. The motive power was electricity and the elevator was operated by a cable. Deceased worked from five o'clock every evening until seven o'clock in the morning. Other employees quit their work at five in the evening and came back at eight in the morning. Between the two latter hours no employees, except deceased, worked in the building.

Claimant's witness, Crumm, who was the employer's foreman under whom deceased worked, testified, over the objection of defendants, that about a quarter of seven o'clock in the morning of "around the 27th or 28th of February, 1930" deceased came to the office to change his clothes, getting ready to go home; that he told the witness that he had come up on the elevator to the top floor and on reaching there he had stepped over to the gate of the elevator and started to lift it; that the elevator started back down without any action on his part to cause it to do so; that deceased had one foot on the floor of the elevator and it came down and struck him on the back of the head or shoulder and "throwed him back on the elevator and hurt his left leg;" that he told deceased to report to Mr. Olson, who was defendant's credit manager. Crumm made no examination of deceased's leg and, therefore, saw no bruises, abrasions or any evidence of any

injury to deceased. Deceased. continued to work until the 6th day of March. Crumm did testify that deceased, upon several mornings after he claimed that he was hurt, complained that his leg hurt him.

Crumm tested the elevator and found that it worked all right but did find that the rope was loose and had it tightened. He testified: "I wanted it fixed before anybody else got hurt, he. (deceased) said he got hurt on the elevator and I wanted it fixed before anybody else got hurt."

Crumm reported to Olson, the manager, the matter of deceased's complaint that he had been injured. Olson investigated the matter by first interviewing deceased. Olson talked with the latter on the "evening following (his) hearing of the accident that morning." The conversation with deceased took place about the evening of February 28th or the evening of March 1, 1930. Over the objection of claimant, Olson testified as to what deceased said to him in reference to the accident, which is substantially the same as that testified to by Crumm, except that Olson said deceased told him that the elevator did not stop but began going down and that deceased was caught between the elevator and the gate and that he was pinned in "in some way;" that deceased said he received a bruise on his head caused by the elevator striking him and knocking him into the elevator; that deceased said that he also received a bruise on the hip; that the witness told deceased: "You realize, Mr. Floyd, we have compensation free of charge, and if you feel this is sufficiently serious enough to demand attention, by a doctor, why I want you to do it." "Q. What did he say? A. He said, 'Well, I don't think it is,' that is about the remark he made, he said, 'I don't believe it's serious enough to require a doctor's attention;'" that the witness went to see deceased on the morning of March 10, 1930, and found him in a semi-conscious condition; that deceased's left leg was quite swollen; that upon the recommendation of Dr. Dorsey, who was employed by both defendants, he called an ambulance and had deceased taken to the hospital.

Olson also testified as to testing the elevator. He claimed that it worked all right but stated that the rope was tightened. He also testified that deceased failed to come to work on the evening of March 7th, which resulted in the witness reporting the matter to the Workmen's Compensation Commission. In this report Olson stated that the accident happened on February 27, 1930. The report was made upon a blank furnished by the Commission. and in answer to the question: "Give cause of accident (stating whether falling object. fall of person, or kind of machine, tool or appliance. etc. and part of machine on which accident occurred)," Olson stated: "Bruised left leg when attempting to leave elevator. Kind of power, Electric. Describe in full how accident happened: When elevator reached top floor employee

started to get off—elevator started down and gate fell on employee bruising left leg." . . . "Parts of .body injured. Left leg." Olson testified that in making this report he had no knowledge that deceased received any injury but relied upon what deceased told him. He testified that he made the report in the line of his duties as an employee of the defendant, A. Y. McDonald Manufacturing Company; that he did not think there was any one else in the building at the time deceased said he was hurt by the elevator; that deceased did not tell him at what hour he was injured; that it seemed to the witness "Like he said it was towards morning;" that he did notice deceased limping.

Deceased's brother testified that he saw him for the first time after the accident on March 4th; that at that time he noticed a place a little larger than a quarter, not quite as large as a half dollar, right below his left knee; that this was a "pretty bad place;" that the witness noticed that deceased limped; that he saw his brother again on Sunday March 8th; that deceased's left leg then was swollen and that he was in "quite an amount of pain;" that at this time the sore was inflamed; that he saw his brother again the evening before he went to the hospital; that his left leg was swollen; that at this time the sore had "scabbed over," but it wasn't healed, . . . it wasn't well by any means."

Deceased's son testified that he worked at a place other than where deceased was employed; that the witness worked during the day time; that he would see his father every morning; that he first noticed his father limping about March 1st; that the limp was a little limp and he did not "think much of it;" that along about the 2nd or 3rd of March his father called him up and asked him if he "could come down and help him clean up. He said he didn't feel very good that night." The witness testified that before his father had this accident there was nothing wrong with him and he did not have any limp.

The witness, Holloway, testified that he was a butcher and sold meat to the deceased, who was at the place of business of the witness nearly every morning about seven o'clock; that about the 27th or 28th of February, 1930, deceased came into the store and "he was kinda limping." Over the objection of defendants the witness was permitted to testify what deceased said about the elevator starting. He stated that deceased told him a similar story as was testified to by the witness Olson in reference to what deceased told the latter. The witness testified that he had never seen deceased limping before; that deceased told him that he did not tell the former's wife because it would worry her, as she was nervous.

The witness, Veletha Cox, who was employed by the defendant, A. Y. McDonald Manufacturing Company, testified, over the objection of defendants, that along the last part of February she heard deceased tell Williams, the manager, that he had been hurt sometime before in the elevator; that after that time she noticed deceased limping when he came to work.

Claimant testified, over the objection of defendants, that on Sunday or Monday (which must have been the 2nd or 3rd of March) deceased told her that the elevator was out of order; that he did not tell her that he had got his leg caught; that he came home on Friday morning (which was apparently the 7th of March) and told her that he was feeling badly; that about three o'clock that day he came down from up stairs where he had been sleeping, staggered across the room and said, ''I am sick, I can't go to work.'' He told her about being caught in the elevator. The witness had had a fall and broken some varicose veins in her leg and had been using liniment and turpentine and she applied these remedies to deceased's leg.

Deceased did not remain in bed Friday evening or Saturday night. On Saturday claimant noticed a sore on his leg a little below the knee cap. She noticed that it had a little yellow material in it. On Sunday morning deceased could not get out of bed, so the witness called a doctor.

About three P. M. of Sunday, March 9th, Dr. Leonard called and examined deceased at the latter's home. He found deceased in bed with a high fever, a rapid pulse and his mind was not very clear. The doctor thought he had pneumonia, but could not find any evidence of this ailment. Upon discovering the condition in his left leg, which was very much swollen below the knee, he advised claimant to send deceased to the hospital immediately. The doctor did not see deceased again. He testified that deceased's leg was ''very little'' discolored; that there was a ''little scab'' just below the knee joint; that the scab, he thought, was about an inch long or a little over and maybe ''half inch wide,'' elevated a little above the surface of the skin.

He was asked a hypothetical question based upon the assumption that deceased was hurt as we have indicated, supra, and was asked, whether or not in, his opinion, the condition he found deceased might or could come from the accident. He answered: ''Well, I should think it might, I don't know that it would every time but I should think it might come from that accident that was nine days before.'' ''Q. Nine, ten or eleven days before? A. Yes, I think it could.''

''By Mr. James: What was your diagnosis? By witness: I thought an abscess, either in the bone or the leg, causing the swelling, causing the delirium, causing the fever.''

He further testified that the wound seemed to be healed; that the swelling was below the scab or "right about the middle of the leg, about equal distance on each side, I think if anything, a little nearer the knee. Q. Swelling from there downwards towards the foot, is that right? A. Yes, wasn't right near the foot about middle part of the leg. Q. Oh I see, didn't extend only about a third of the leg? A. Yes."

Dr. Jacobson, who was called by deceased's family, testified that he saw deceased and examined him at his home about eleven P. M. of Sunday, March 9, 1930; that at that time he was apparently rational; that he had a fever, but there was nothing to account for this; that on the left side of his leg he had a "partially healed wound amounting to a moderate bruise two centimeters in diameter (a little under an inch) just below and lateral to left patella, swelling and tenderness over upper third of cap of left leg; tenderness over third or left tibia." . . . "Q. You mean what you found? A. Yes. Q. Yes, give us what you found. A. Well, I felt that he had either a deep soft tissue infection in the upper third of his leg or possibly an osteomyelitis, I recommended he be brought to a hospital and X-rayed and possibly operated."

The doctor did not see deceased again. He was asked a hypothetical question based upon the manner in which it is claimed deceased was injured, and was asked, whether or not, in his opinion, the condition he found deceased in, might or could come from the elevator accident. The Commissioner ruled that it would be better to "confine it to say whether result of trauma, or injury."

"Q. All right, whether result of trauma or injury? A. I cannot say absolutely what produced this infection as he had it, but that is the most probable etiology having an open wound on the knee, it's about the only etiology that we have to go by but it's not absolutely necessarily due to that injury.

"But in your opinion, it could come from accident or trauma? A. It could come from an accident."

The witness further testified that the bruise he found had no discoloration about the leg; that it was beginning to scab but not entirely healed; that he thought deceased was suffering from "either osteomyelitis or deep seated soft tissue infection, he didn't have any induration, any hardness or any evidence of fluctuation in the upper third of the calf." "Q. What do you mean by fluctuation? A. It's evidence of—or pointing to an abscess. Q. Now you advised that he be sent to a hospital first thing in the morning? A. Yes, sir."

Dr. Dorsey, who was employed by defendants, testified that at the request of the employer he examined deceased at the hospital about ten A. M. of Monday, March 10, 1930; that at that time the latter

was in a delirium; that he was unable to arouse deceased; that, deceased's "left lower leg was swollen the entire leg from the knee down about three or four times higher than the right, pressure over calf of leg caused him to moan as if in pain; tenderness in the calf of this leg fluctuated meaning by that there is a feeling of floating underneath the skin when you put your hands on it, the skin was discolored, the calf was hot to touch; diagnosis was made of suppurative cellulitis followed by a general septic condition; associated with this condition in leg there was a very disagreeable odor of the part; treatment consisted of multiple incisions and drainage of calf of left leg, immediate anesthesia following this; following the operative procedure he was placed in a private room, special nurse placed on case, forced fluids were given, sedatives for rest and hot packs on leg and Floyd seemed at first, to show evidence of improvement in the first twelve hours but this soon changed and Floyd died March 12, 1930, somewhere around three P. M.''

' After death an autopsy was performed which confirmed the doctor's diagnosis. The doctor testified that cellulitis is an inflammation of the cellular tissue of the leg or any part of the body. The doctor testified that death resulted "from general septicemia, contributing cause supperative cellulitis on the left leg, secondary cause, injury, unknown nature,''' and that he so stated in the death certificate. The doctor testified that a septicemia infection or blood poisoning is caused by a streptococcus bug entering through an open wound, and is not directly caused by trauma; that deceased had two little abrasions on his left leg when he saw him, one below the knee and one just above the ankle; that they were about the size of a quarter; that there was no scab on them as they were healed; that deceased "was in a deplorable condition when he came in, I mean that upon removal of his pajamas and underwear, absolutely stiff from dried excretions and urine, this man was voiding and the private parts were excoriated and swollen so much that it was impossible for us to use medication in the form of enema.''

The doctor was asked a hypothetical question based upon the assumption that deceased was injured in the elevator accident in the manner we have already indicated. The witness was asked whether the condition he found deceased suffering from, might or could have come from, or been contributed to, by the accident or trauma. He answered: "Well assuming these facts you have given, Mr. Prewitt, I will say it is possible it could be an indirect cause of his condition.'' The doctor further testified that the condition around deceased's private parts could have caused the infection or blood poisoning; that it would have been impossible for the wound on the leg to have healed between midnight and ten o'clock the next morning when he first saw deceased.

The witness further testified:

"Q. Counsel has inquired in regard to an injury to his leg, there is no claim there was any broken skin upon this man's head, if he died from septicemia, could not, Doctor in your opinion, he very well have reached a condition of sepsis or septicemia through infection from his private parts in the shape they were in, as any cut he may have had? A. That's possible.

"Q. I will put it this way—you would say, would you not, that naturally a probable consequence which you would usually and regularly expect to flow from small bruise not condition you found this man in, that's true isn't it? A. Well, in the large majority of cases only the exceptions."

He was later asked: "Doctor, assuming that this man received an injury on the 27th or 28th could septicemia develop in this form? A. It could. . . . Q. Now, a man can get streptococci infection in his throat without any cut or without any bruise, can't he? A. He certainly can. Q. And so far as this man's wound is concerned, if you call it a wound—you say it was healed at the time you saw it? A. It was. Q. And if—*if you had no history of any accident, or any injury* doctor in connection with this patient, would you have attributed his condition at the time you saw him to any trauma—or rather would you have attributed his condition in regard to the septicemia to the bodily conditions you found in the rest of the body? A. Well, to put it plainly I would have been up a tree to know what caused it." (Italics ours.)

It is insisted by defendants that the finding that deceased was injured while in the course of his employment with the defendant rests entirely upon hearsay, as deceased's narration as to the injury was no part of the *res gestae.*

It is unnecessary for us to say whether these narrations were competent, for the reason that, assuming that they were not competent, there was sufficient evidence to support the award, contained in the report made by Olson to the Workmen's Compensation Commission. [Beck v. Whittlesberger, 148 N. W. 247; First National Bank v. Industrial Comm., 161 Wisc. 526; McCartney v. Wood-Temple Co. (Mich.), 187 N. W. 251; Bresbee v. Clark Equipment Co., 214 Mich. 235; Phillips v. R. R., 211 Mo. 419, 439, 440; Downey v. Ry., 285 S. W. 791.]

It is claimed by defendants that there is no competent evidence that the death of deceased was caused by the alleged accident. In this connection defendants say:

"There are many authorities holding that testimony by a doctor that the injury or death might have been caused, by a compensable accident, is not competent testimony on the question of causation. This point is overlooked in respondent's brief."

In this connection defendants further say,, that none of the doctors testified that, in his opinion, the bruise was the cause of the blood poisoning.

We think the case of Sanitary Dist. of Chicago v. Industrial Commission (Ill.), 175 N. E. 372, and like cases cited by defendants, uphold their contention, but the rule announced in those cases is not in force in this State. In the last case cited the court said 1. c. 375:

"The answer of Dr. Scott to the hypothetical question was that there might or could be a direct causal connection between the accident and the condition described in the hypothetical question. He did not answer that there was a causal connection, but, simply that there might or could be one. Dr. Stevens' answer was substantially the same. In Sears, Roebuck & Co. v. Industrial Com., supra, on page 254 of 334 Ill., 165 N. E. 689, 692, it was said: 'It is very clear from the testimony of all the doctors that, in concluding that there was causative relation of the accidental injury to the death, the witnesses were considering mere possibilities.' That fact is true in this case, and this evidence was not sufficient, under the law, to establish a connection between the injury and the subsequent condition of English."

All of the courts hold that the answer of a medical expert to a hypothetical question must not be speculation but must, in fact, be an expression of his opinion. Whether a physician may state that there might or could be a causal connection between an accident described in a hypothetical question and the condition of injury is a matter upon which the courts differ. [See 22 C. J., pp. 666, 667, 668; O'Leary v. Steel Co., 303 Mo. 363, and cases cited therein.] Prior to the decision in the O'Leary case it was held in this State that it was error to permit a medical expert to state that there was such causal connection, for the reason that such testimony would be invading the province of the jury. [See Smart v. K. C., 208 Mo. 162, 199 to 203; O'Leary v. Steel Co., supra.]

In the O'Leary case the rule in this State was changed so that it is now competent for such witness to state that there was, in fact, such causal connection. However, the O'Leary case does not hold that it is improper to ask a witness if the hypothetical accident might or could cause the diseased condition. It has been held that the "might or could" rule was not overruled by the O'Leary case. [See Stewart v. Am. Ry. Express Co., 18 S. W. (2d) 520; Nelson v. K. C. P. S. Co., 30 S. W. (2d) 1044.]

It is therefore, apparent that the cases relied upon by defendants do not announce the rule in force in this State. Deceased's leg gave every indication that the seat of the trouble was there rather than in his private parts. We think there is no question but that there

was sufficient medical testimony from which the jury could find that the death of deceased was caused by the accident. [Huelsmann v. State, 28 S. W. (2d) 387, and cases cited therein; Gunn & Co. v. Woody et al. (Ky.), 39 S. W. (2d) 998, 1000; Billiter & Wiley v. Hatfield (Ky.), 40 S. W. (2d) 326.] However, Dr. Dorsey's testimony comes very near meeting the requirement of the Illinois case. He testified: "Death resulted from general septicemia, contributing cause supperative cellulitis on the left leg, secondary cause, injury unknown nature."

Defendants insist that the court erred in rendering judgment for interest. There is no merit in this contention. [Howes v. Stark Bros. et al., 22 S. W. (2d) 839; Sec. 3312 (b), R. S. 1929; Hazard, etc.; Corp. v. Scott (Ky.), 268 S. W. 548; Warren's case (Mass.), 172 N. E. 254; Garcia v. Salem Brick & Lbr. Co. (La.), 92 So. 335.]

The judgment is affirmed. All concur.