MUTUAL BENEFIT HEALTH & ACCIDENT ASS'N v. FRANCIS.

No. 12976.

Circuit Court of Appeals, Eighth Circuit.

April 11, 1945.

Henry I. Eager, of Kansas City, Mo. (Robert E. Coleberd and Michaels, Blackmar, Newkirk, Eager & Swanson, all of Kansas City, Mo., on the brief), for appellant.

William G. Boatright, of Kansas City, Mo., for appellee.

Before GARDNER, THOMAS, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, Mutual Benefit Health and Accident Association, prosecutes this appeal from a judgment establishing its liability under an accident insurance policy.

By its policy, issued May 3, 1939, it insured appellee's husband John Pritchard Francis, against loss of life, limb, sight or time resulting directly from accidental means and against loss of time resulting from disease contracted during the term of the policy. The policy was in effect at the time of assured's death. Proofs of claim of accidental death were submitted to the company but it denied liability and this action resulted. It will be convenient to refer to the parties as they were designated in the trial court.

On trial of the action, at the close of plaintiff's testimony, and again at the close of all the testimony, defendant moved for a directed verdict, which motion was denied and the case was submitted to the jury on instructions to which certain exceptions were saved by defendant. The jury returned a verdict in favor of plaintiff on all the issues and from the judgment entered thereon defendant prosecutes this appeal. In seeking reversal it urges that: (1) the court erred in denying defendant's motion for a directed verdict; (2) that the court erred in its rulings on the reception of certain evidence designated by it; (3) the court erred in certain portions of its charge to the jury.

In considering the question of the sufficiency of the evidence presented by the denial of defendant's motion for a directed verdict, we must accept as true the evidence favorable to plaintiff, and we must assume that the jury determined all conflicts in the evidence in her favor. She is also entitled to the benefit of all inferences which may reasonably be drawn therefrom. If the evidence so considered was such that reasonable men might reach different conclusions, then the case was one for the jury. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844; Illinois Power & Light Corporation v. Hurley, 8 Cir., 49 F.2d 681.

Assured at the time of his death was 58 years old. He had been married to and lived with the plaintiff for 21 years. Dur-

ing that time he had consulted a physician but once and that was with respect to his teeth. Prior to the accident he was continuously at work and had not missed a single day's work on account of sickness in over twenty years, and he was in apparent good health. On April 2, 1942, at 7:30 p. m., he fell down the back steps of his home. While he was in the house plaintiff turned the water on the back steps of the house and as the assured came out and started down the steps he slipped and fell on the second from the bottom step, falling on his left side. In answer to inquiry whether he was hurt, he exclaimed, "Help me up. My God, I didn't see the steps were wet." He was helped into the house, where he laid down on the davenport, complained of being cold and complained of pain in his side. On examination his side was found to be red. He stayed on the couch one-half hour, when he had a phone call, to which he replied, "I can't go," but being unable to secure anyone else he got up from the couch and left his home for an hour and a half, when he returned, complaining of his side and arm. The following day he did not eat his breakfast. In the evening of that day he refused to eat dinner and laid down on the couch. He looked sick and gray and was cold. The next day, April 4, he did not eat his breakfast but drank a little tomato juice; that afternoon he returned earlier than usual from the office. He was sick and gray and pale in appearance. He spent the afternoon lying down and ate nothing that evening. The following day, Sunday, April 5, he did not eat breakfast but remained in his bed until 11 o'clock a. m., and then went with his wife to church, being gone about one hour. When they returned home he again laid down, his eyes looked very heavy and droopy and his face was pale. He ate no solid food on Sunday but drank a little coffee, and laid down during the afternoon. On Monday, the 6th, he did not eat breakfast but went to his office. He had no dinner that evening. On Tuesday, the 7th, he ate no breakfast, and although the day was warm he put on a winter suit and overcoat before going to the office, although he had theretofore been wearing a spring suit. He did nothing that required physical exertion after his fall. On Tuesday, the 7th, while at his office he was taken suddenly ill and was moved to the hospital where he died. An autopsy was performed, disclosing a fresh thrombotic occlusion approximately one inch from the orifice of the coronary artery. The immediate cause of his death was coronary thrombosis. The autopsy revealed diffuse arteriosclerosis of both the right and left coronary arteries, with ulcerative arteriosclerosis of the left coronary artery. The inside of this artery was almost occluded.

Dr. George C. Lee, a heart specialist, explained that a coronary occlusion means anything that occludes or shuts off the coronary artery which supplies the heart with blood, and that a coronary thrombosis or thrombotic occlusion means that the thing that has shut off the blood supply to the coronary artery is a blood clot. Arteriosclerosis is commonly known as hardening of the arteries. Symptoms of coronary occlusion are pain in the chest or in the arms, a feeling of indigestion, shortness of breath, pain in the abdomen or legs. There may be short attacks during a period of several days and usually where there is a sudden ending of the occlusion there is a terrific pain felt in the chest, radiating to either or both arms and often into the abdominal region. An occlusion may be forming over a considerable period of time previous to the final occlusion. The time consumed between the beginning of a thrombotic occlusion until it reaches the point of progress which discloses its symptoms may extend from a week to ten days of symptoms, and often it takes longer. Coronary thrombosis is infrequently caused by blows on the chest that have shown no penetration or crushing of the chest wall. A patient who has arteriosclerosis is more likely to suffer coronary occlusion through strain, effort or trauma than one who does not. Where coronary sclerosis is present, effort is frequently the cause of thrombosis, while external trauma is fairly infrequent. Effort causes the arteries to contract and dilate and where there is coronary sclerosis present any effort either physical or mental, or mental excitement may cause a spasm of those arteries and thereby increase the likelihood of the thrombosis forming. Fifty per cent. of the cases that have coronary thrombosis have it at a time of either physical or mental over-exertion. Arteriosclerosis is a condition frequently found in people of middle age.

In answer to a hypothetical question embodying the entire history of assured's injury and symptoms up to the time of his death, the doctor answered that the thrombasis of the coronary artery might have

had its inception at the time of his fall; that cases of coronary thrombosis frequently have their inception several days before final occlusion in which they have their pain. Often the patients think they are having indigestion and refuse to eat and finally have their complete occlusion and severe pain, and it may be sudden death or they may recover. Many of those who are afflicted with the ailment are not aware of the seriousness of their condition at the time of its incipiency. If assured had the fall described, and if that was the precipitating cause of his acute coronary thrombosis, he was seriously ill from that time and was not able to be up and around and attending to his duties. The heart does not enlarge from sclerosis or degenerative processes—it enlarges from overwork, from some other cause than has caused it to overwork, and in this particular case from hypertension.

Dr. Cecil Kohn, a heart specialist, in answer to a hypothetical question embodying the history of the case, stated that the thrombotic occlusion found on postmortem in assured's heart could have been precipitated by the fall he suffered; that a person with coronary sclerosis may have precipitated in the coronary artery a thrombus as a result of over-exertion, emotional upset, excitement, or anything that might produce a sudden change in circulation. A thrombus is a blood clot. There are two stages of the thrombus—one is the time when it starts to grow and develop, the beginning of the clot, and the other when it reaches the point where it occludes, that is shutting off the blood supply completely. The time interval may be several days. If assured's fall was the precipitating cause of the thrombotic occlusion, then he was a very sick man from that moment and should have been in bed; that while the characteristic symptoms of the coronary occlusion are pain in the chest, radiating out to the arms and frequently down the arms and more frequently down the left arm to the fingers, and occasionally radiating into the abdomen, even simulating an attack of gall bladder or appendicitis, some people have an attack without pain. In cases where final occlusion occurs while the patient is in bed or asleep, the occlusion itself may have started days before when the patient was exerting himself. As to characteristic symptoms at the outset of an occlusion, it might be

indigestion, it might be vomiting, might be a feeling of weakness, or "just feeling poorly;" that the time elapsing from the beginning of the thrombus to the complete occlusion might be a matter of days. On cross-examination this witness was asked:

"Q. You don't feel that you can tell this jury with any reasonable degree of definiteness that that fall, that amount of trauma, that type of fall, now, not a crushing blow to the chest or anything of that sort, that that amount of trauma, with the man going on and doing substantially his regular work for four days, you can't tell this jury with any degree of definiteness that that fall actually caused that thrombus to begin, can you, with the conditions he had in his heart? A. Yes, I can. On a different idea, however, than you seem to be interpreting for me. I feel, in my opinion as to the fall, that is, not in this particular case but any fall, that the direct trauma itself is just one factor; that quite frequently in a fall, with the suddenness of it and the exertion and all that goes with that, there is a sudden increase in the pressure in the blood vessels and that in itself is what precipitates the attack rather than any direct trauma to that individual's heart or chest, so that I could see how a fall, without striking at all, merely falling down the steps without striking himself and producing any bruises would precipitate an attack such as this, not on the basis of the direct injury but on the basis of the sudden rise in pressure as a result of the exertion."

Experts produced by defendant expressed the opinion that the fall suffered by assured had no effect in causing his death. Dr. P. H. Owens called by defendant, admitted that effort will produce coronary thrombosis; that if a man suffers excitement, emotion, or strain of any kind, physical or otherwise, that throws a load upon the heart, which may be the precipitating cause of a thrombus; that a fall suffered by a man who has diffused coronary sclerosis might produce the formation of a blood clot. If assured did suffer a severe fall which raised his blood pressure and raised the load upon his heart, he was a very sick man from the time the thrombus began to form until its final occlusion.

Dr. C. G. Leitch, a pathologist, who had performed many autopsies and who performed the autopsy upon the assured's body, called by the defendant, testified that the

fall suffered by assured had no effect in causing his death; that physical effort or strain, such as involved in a fall, does not operate to start a thrombotic occlusion.

Dr. Albert E. Upsher, called by the defendant, expressed the view that assured's fall did not cause his death.

■■ There was other testimony bearing on the extent of assured's injury resulting from his fall. There is no question but that the fall was accidental and was not the result of disease. The policy is a Missouri contract and the action originated in that state, and jurisdiction of the Federal court is dependent wholly upon diversity of citizenship. The right of recovery must be determined by the laws of Missouri. The Missouri appellate courts have held that if an accident sets in motion agencies that result in death, such injury is regarded as the sole, direct and proximate cause of death, even though the injured person were suffering from physical infirmity or disease. An injury which causes the death of a person in impaired health or suffering from disease is the cause of his death even though he would not have died if his health had not been impaired. Elbe v. John Hancock Mutual Life Ins. Co., Mo.App., 155 S.W.2d 302; Rieger v. Mutual Life Ins. Co., 234 Mo. App. 93, 110 S.W.2d 878; Driskell v. United States Health & Accident Ins. Co., 117 Mo.App. 362, 93 S.W. 880.

■ It is pointed out by defendant that plaintiff's expert witnesses did not testify that the fall suffered by assured caused his death, but only expressed the opinion that it might or could have caused it. Hence, it is argued that there was no substantial evidence that the fall caused the death of assured. Many courts, including the Missouri appellate courts, formerly held that it was reversible error to ask an expert witness his opinion on the ultimate question to be decided by the jury, on the theory that such testimony invaded the province of the jury. This court has ruled that an expert witness may properly be asked his opinion as to an ultimate fact. United States Smelting Co. v. Parry, 8 Cir., 166 F. 407; Cropper v. Titanium Pigment Co., 8 Cir., 47 F.2d 1038, 78 A.L.R. 737; Woelfle v. Connecticut Mutual Life Ins. Co., 8 Cir., 103 F.2d 417. Since the decision in O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55, this has also been the rule in Missouri. From the fact that plaintiff's experts were not asked and did not express an opinion on the ultimate question of whether or not assured's death resulted from the fall, it is argued that their testimony is without probative force. This, we think, does not necessarily follow. Floyd v. McDonald Manufacturing Co., 226 Mo.App. 444, 46 S.W.2d 251; Feltz v. Terminal Railroad Assn., 336 Mo. 790, 81 S.W.2d 616; Mueller v. St. Louis Public Service Co., Mo.App., 44 S.W.2d 875. If these experts gave no testimony other than the answers to the hypothetical questions, there would doubtless be force in appellant's argument. Massachusetts Protective Association v. Mouber, 8 Cir., 110 F.2d 203. But they gave other testimony relative to the nature and characteristics of the heart attack, and explained the susceptibility of his circulatory system as disclosed by the postmortem, to injury from stress, excitement, or trauma. Having before them the physical facts as disclosed by the postmortem, they explained to the jury why the heart and arteries of the assured would more readily be affected by any unusual stress or shock than if they had been in normal condition. It is to be observed too that on cross-examination Dr. Kohn in effect testified that he could tell the jury with reasonable certainty and definiteness that the fall actually caused the thrombus to begin. There was other testimony which stands without dispute that prior to the accident and injury assured had been working regularly and had not missed a day's work because of ill health in twenty-one years, and was in apparent good health, enjoying a good appetite and living normally; that immediately and continuously following the accident he was sick and continued sick until his death which occurred five days following the accident. Unlike the facts in Massachusetts Protective Association v. Mouber, supra, there is here no evidence tending to show that the accident resulted from assured's disease. In the Mouber case as it was held under the evidence to be as probable that the insured's accident was the result of a heart attack as that a heart attack was the result of the accident. The medical testimony enabled the jury to determine from all the evidence whether or not the fall precipitated the coronary thrombosis resulting in assured's death. In Wheeler v. Fidelity & Casualty Co., 298 Mo. 619, 251 S.W. 924, 929, the Supreme Court of Missouri, considering the contention that the testimony of plaintiff's experts was insufficient to warrant a ver-

dict for plaintiff because it left to conjecture as to which of several possible causes produced assured's death, said:

"It is true that a mere probability is not proof, and that the sum of two such probabilities is only a probability. Day v. Railroad, 96 Me. 207, 52 A. 771, 90 Am.St. Rep. 335. But it would not have been necessary, under the evidence, for a finding that the insured's death was caused by the injury to his eye to have rested upon a mere probability. The evidence shows without conflict that immediately prior to the injury he was actively engaged in his vocation as a traveling salesman, and his health to all outward appearance perfect. Immediately following the injury a most virulent infection set up in the eye; ulcer followed ulcer for a period of more than three months. During that period his appearance gradually changed, he became greatly reduced in flesh, he became increasingly nervous and his face grew thin and drawn. These conditions progressed relentlessly until he died. The only outward and visible cause of his sudden decline from normal health to feebleness and death was the injury to the eye. Nor does the testimony of the physicians disclose any other. According to that there were no active manifestations of syphilis during any of the time. On this evidence dealing only with the tangible external facts and conditions that followed in an unbroken chain of sequence from the initial injury of the insured to his death, there being no other facts or circumstances reasonably accounting for his death, a jury would be justified in finding that the injury was the cause of his death."

In De Mact v. Fidelity Storage, Packing & Moving Co., 231 Mo. 615, 132 S.W. 732, 734, it was urged that no jury question was presented. In the course of the opinion as to the conjectural character of the expert testimony, the court, among other things, said: "With evidence in the case to the effect that deceased was apparently strong and healthy before the accident, she immediately took to her bed and there remained until her death, it will not do to say that the case is one falling within the rule of conjecture."

In MacDonald v. Metropolitan St. R. Co., 219 Mo. 468, 118 S.W. 78, 82, 16 Ann.Cas. 810, it was argued that there was no substantial evidence that the death of plaintiff's intestate was caused by the injuries sustained in an accident. In that case, as in this, death resulted from heart trouble and it was argued that the angina pectoris might have arisen from so many different independent causes that "to predicate it of his injury is mere conjecture." In the course of the opinion it is said:

"Evidently the fact that Judge MacDonald returned, in a crippled way, to his avocation could not be conclusive. It was a circumstance, but one for the jury. The heroism of facing one's fate in civil life like a soldier does his in war, and performing one's duty as best he can until the end comes, is not inseparable from a prior injury eventually ending one's life. Labor, under such conditions, is referable to grit and courage, or the lack of these, to temperament, duty. If he had done no work at all after his injury, that fact alone would not have made a case for plaintiff, nor did his doing it destroy her case.

"Nor do we have to go to physicians to find that medical science has not developed to the point where a doctor, however wise, can tell to a certainty whether a disease exists in the heart for one, two, three, or four months after an injury, or that such insidious diseases not uncommonly quite baffle diagnosis. It must be borne in mind, too, that doctors' theories under oath on the witness stand are merely advisory in character. Juries can take or leave that advice on the condition only that it seems reasonable or not to them; and, because doctors disagree, it is not valid reasoning to say that juries should also disagree, or should take the advice of one set as against that of another, or should throw to the winds their common sense, and, with minds littered up with conflicting medical advice, be unable to come to any agreement whatever, even as sailors, tossed to and fro by contrary winds, reach no harbor."

In Rieger v. Mutual Life Insurance Co., 234 Mo.App. 93, 110 S.W.2d 878, 881, action was brought on a policy for accidental death. In that case, as in this, assured fell while descending the back steps of his home. He immediately suffered intense pain which was continuous and grew worse. No physician was called until three days later. He was finally taken to the hospital. An operation disclosed that a clot of blood had lodged in the peritoneal cavity. The physician performing the operation testified that in his opinion the fall could have caused the condition he found. Another physician testified that it was possible for a man to injure the pancreas by falling on

596

the steps. A physician called by defendant, however, who treated the assured more than a year before his injury, testified that at the time he treated the assured he was suffering from chronic gall bladder trouble, and other physicians testified that the fall could not have caused the hemorrhage resulting in assured's death. It was argued that the evidence was insufficient, leaving the matter of the cause of assured's death in speculation. Among other things the court said: "We can see no substantial merit in this contention. It may be that the testimony of the physicians went no further than to show that the accident could have caused the hemorrhage, but in addition to this the testimony for plaintiff shows that the insured prior to the accident was in an apparent state of good health, and had not suffered any pain in the abdominal region, and that immediately following the accident he began to suffer severe pain in that region which continued and grew worse down to the time of his death, and that 12 days after the accident an operation revealed a 'tremendous clot of blood—old clotted blood—in the so-called lesser peritoneal cavity.' The evidence shows no hemorrhage prior to the accident."

Under the Missouri decisions, we think the evidence considered in a light most favorable to the plaintiff in connection with such inferences as might reasonably be drawn therefrom, made a case for the jury on this phase of case.

The policy contains provision that the assured must have been continuously and wholly disabled by bodily injuries, independently and exclusively of disease and all other causes, from the date of the accident to the date of death, and it is contended that even conceding that assured's accidental fall ultimately proved fatal, still he was not continuously and wholly disabled thereby. It is observed that the policy does not contain the word "immediately," but does contain the word "continuously." We have already held that the evidence was sufficient to warrant the jury in finding that the coronary thrombosis was precipitated by the fall. Accepting that as an established fact, it follows from the undisputed medical evidence that continuously thereafter he was a very sick man, and all the doctors agree that assuming that fact, he should have been at rest wholly inactive, and that any physical ex-

ertion was not only detrimental to his health but endangered his life. It required such time as the processes of nature consumed in bringing the assured to a state of total disability. Certainly he was totally disabled from the time he was stricken until his subsequent death in the hospital. Immediately following the fall he complained continuously of pain and suffering; his appearance became gray and pale; he was cold and clammy, ate practically nothing, and while he was at home spent his time lying down. True, there was evidence that he went to his office and performed some of his duties. His superior officer, who was in and out of the office during the time, did not observe that he was not performing his usual duties, and two young lady clerks without any definite recollection, observed that he was on duty and at least performing some of his duties during the days subsequent to his accident. The test seems to be not whether he performed but whether he was able to perform, and under the Missouri decisions the total disability contemplated by an accident insurance policy does not mean a state of absolute helplessness, but rather such a disability as renders the assured unable to perform all the substantial and material acts necessary to the prosecution of his occupation in the customary and usual manner. It is established by the Missouri decisions that one is wholly disabled if he is not able to pursue his occupation without running serious risk of increasing his disability or shortening his life. Wiener v. Mutual Life Ins. Co., Mo.Sup., 179 S.W.2d 39; Zips v. Mutual Benefit Health & Accident Assn., Mo.Sup., 169 S.W.2d 62; Heald v. Aetna Life Ins. Co., 340 Mo. 1143, 104 S.W.2d 379; Comfort v. Travelers Ins. Co., Mo. App., 131 S.W.2d 734. In Wiener v. Mutual Life Ins. Co., supra [179 S.W.2d 43], the Supreme Court of Missouri, among other things, said: "The rule is recognized that an insured is disabled if he is not able to work without running the risk of increasing his disability or of shortening his life."

In Comfort v. Travelers Ins. Co., supra, the Missouri Court of Appeals, reversing the trial court because of an erroneous instruction, among other things said [131 S. W.2d 741]: "This instruction directs a verdict for defendant on what the plaintiff did rather than on what he was really able to do, within the meaning of the policies, in view of his physical condition as shown

by the evidence. * * * The instruction wholly ignores the evidence tending strongly to show that what plaintiff did he was really unable to do, within the meaning of the policies, in view of his physical condition, in that in doing what he did he was subjecting himself to the hazard of bringing on a fatal heart attack at any time. For this fault, if for no other, the instruction is reversibly erroneous."

█ In view of the finding of the jury, it can not be gainsaid that assured was wholly unable to perform any service requiring physical exertion subsequent to his accident, and the finding of total disability was therefore sustained by substantial evidence.

█ It is urged by defendant that the cross-examination of its expert witness Dr. Leitch, who had performed the autopsy and who on direct examination expressed the view that deceased's death was in no way attributable to his fall, was prejudicial. He was interrogated on cross-examination relative to the views expressed in an article which appeared in an issue of the American Medical Association Journal entitled "Angina Pectoris and Cardiac Infarction from Trauma or Unusual Effort." It is urged now that the cross-examination was improper because the witness did not recognize the author as an authority and that the article had not been proved to be authoritative or standard. First we think it important to observe that no such objection was urged to this testimony when it was offered. The witness testified that the Journal of the American Medical Association was an authoritative publication, or one of the recognized publications of that association, and that it from time to time published the findings and the conclusions of men who were particularly qualified to express a view upon the subject they wrote about. There was also testimony that the authors of the article referred to had written extensively on the effect of trauma in precipitating coronary occlusion, and that their writings were published in the Journal of the American Medical Association. His attention was then called to an article in a copy of the Journal by a Dr. Boas, of New York City. The witness testified that he did not recognize the name and did not think he had ever read the article. He was asked if he recognized the names of Bean and Mills as eminent in the field of heart. He was then interrogated as follows:

"Q. You don't know those. 'Bean and Mills in a recent study of 1,640 attacks of coronary occlusion found that in northern cities these attacks occur with much greater frequency in winter than in summer. There were twice as many attacks in January as in August. They conclude that the greater frequency of infections and the heightened metabolism in cold weather increase the work of the heart and so add to the hazards to which these patients are exposed.' Do you agree with that statement, Doctor?

"Mr. Eager: I object to that as wholly immaterial, improper cross examination. It is stating other specific instances; it is argumentative.

"The Court: All right; overruled.

"Q. Now, of course, I do not undertake to question you as to whether or not you have had the experience in the northern cities. I presume you have not. But would the conclusion expressed there be in accord with your experience? A. My experience has been in the study of hundreds of cases of coronary thrombosis, which I have presented to the local medical society, that even in a mid-central state that coronary thrombosis occurs considerably more frequently in the winter months than it does in the summer months.

"Q. So then you agree with the statement? A. Well, I am not necessarily in agreement with it, but that is my observation.

"Q. All right. Now, I want to ask you this, Doctor: In this article—I will preface it by saying that Dr. Boas sets out a number of clinical cases, giving the history. You are familiar with that practice of doctors' writings, are you not? A. That is one of the methods of approach.

"Q. All right. Then he makes this statement: 'These anatomic studies suggest how unusual exertion may bring about coronary artery occlusion. With physical effort there is a sudden alteration of arterial pressure, cardiac action is increased, rupture of one of the capillaries or sinusoids in the arterial wall may occur, or a softened atheromatous plaque may rupture into the arterial lumen. If the hemorrhage is large there may be almost immediate occlusion of a coronary artery:'—do you agree with that statement?

"Mr. Eager: Just a moment now. That is a statement based on individual cases which are in no wise similar to this case.

They are on different facts. They are different types of occlusion. The same questions are not involved here. You can't possibly liken them to this case in any substantial respects. It simply illustrates the impropriety of this type of cross examination; it is argumentative; it is misleading to the court; it is misleading to the jury, and I think it is highly improper. There is just no end to where it will lead if it keeps on.

(There was no ruling on the objection).

"Q. Now, you heard what I read and I am asking you do you agree with that expression, that opinion? A. For the purpose of the answer to the question, observations that are stipulated as from an anatomic point of view in that particular statement are true and those are what we observe existing in diseased—hemorrhages, for instance, in diseased arteries, but our observation is that they are not any more frequent in strain or effort than they are under ordinary circumstances.

"Q. But, Doctor, the real point of the thing I read you was this: 'If the hemorrhage is large there may be almost immediate occlusion of a coronary artery;'—A. That is right.

"Q. Do you agree with that? A. That is right.

"Q. Now, I will read the balance of the sentence:—'if the hemorrhage is small or slow or if it is followed by a gradually growing mural thrombus the occlusion may develop slowly or remain incomplete.' Do you agree with that? A. No, I don't agree with that.

\* \* \* \* \* \*

"Q. Now, is this a correct statement, in your opinion: 'There is considerable variation in the time that elapses before the full symptoms and incapacity develop.' Is that correct?

"Mr. Eager: Object to that for the same reasons, that it is based on other facts, based on different cases, based on matters that can not possibly be applied to this case; it is misleading and argumentative and speculative.

"The Court: He may answer the question.

"A. I think the symptoms of their onset are at the time that the occlusion becomes complete.

"Q. Do you agree with this statement: 'In many instances extensive cardiac damage occurs immediately after the accident or follows within a few hours. In others there is a free interval of many hours or even of several days between the accident and the development of major cardiac damage, and during this interim the patient may complain of little beyond weakness and some uneasiness in the chest.' Do you agree with that statement of Dr. Boas?

"Mr. Eager: I make the same objection, and suggest that the article be read in its entirety so we can see what he is talking about.

"Mr. Boatright: I would be glad to put it in.

"Mr. Eager: We haven't time to read the whole article and without that nobody can intelligently answer that question. I don't know what he is talking about.

"The Court: You may answer.

"A. The answer is that I do not believe that is a fact because having examined innumerable, hundreds of bodies subjected to trauma of the chest, I haven't in one single occasion been able to substantiate the statement that is made by that particular writer."

Nowhere in any of the objections interposed was it suggested as basis for the objection that the authority was not a standard authority. We should not reverse the court for its ruling on the admissibility of evidence upon grounds not urged in the trial court. Cockrell v. United States, 8 Cir., 74 F.2d 151; Metropolitan Life Ins. Co. v. Armstrong, 8 Cir., 85 F.2d 187; United States v. Nickle, 8 Cir., 70 F.2d 873. The witness was a medical expert. His testimony was apparently based largely upon his own experience and the extent to which a medical expert may be impeached upon cross-examination with respect to his knowledge of a particular subject by reference to medical authorities is a subject upon which the authorities are not in harmony. As said by Judge Sanborn, speaking for this court, in Woelfle v. Connecticut Mutual Life Ins. Co., supra [103 F.2d 420]: "Whatever the correct rule may be, it is apparent that the scope of such cross-examination must necessarily be left largely to the good common sense and sound judgment of the trial court, whose rulings should be upheld unless they constitute a clear abuse of a sound judicial discretion."

We think there was no abuse of discretion in overruling the objections actually made to this testimony. Whether or not it may have been subject to other objections

we need not determine. We have considered the contentions of counsel as to other rulings of the court on the admissibility of evidence but in view of our conclusions already stated on other issues we think these contentions are wholly without merit.

It is finally contended that the court's charge was misleading and confusing as to the issue of total disability. The court charged that the jury must find not only that there was an accidental injury, but that disability resulted from injury accidentally inflicted or arising from accidental causes which continuously and wholly disabled the assured from the time of the accident to the time of his death. In this part of the instruction the court purported to embody the vital provision of the insurance policy. On the question of total disability the court instructed as follows: "This provision of the contract of insurance does not mean that the insured to be so disabled must have been unable to perform any of the duties of his occupation. If you find and believe from the greater weight of the evidence that the insured was by accident and by accidental injury rendered unable to perform a substantial part of his duties in the usual manner in which he ordinarily performed them from the time of his accidental injury, if he was accidentally injured, until the time of his death, then he was continuously and wholly disabled within the meaning of the contract of insurance. If, however, you fail to find those facts, or if you conclude that the insured was able to perform or did perform a substantial part of his ordinary duties in the usual way after the accidental injury, if any, and prior to his death, then he was not totally and wholly disabled within the meaning of the policy."

In our view, the instruction correctly stated the law as announced by the decisions of the Missouri appellate courts. In a requested instruction defendant asked the court to charge the jury that it must find that the assured was continuously and wholly disabled by reason of bodily injuries sustained in the alleged fall from the date thereof to the date of his death, and "if you find that he performed his regular work or the substantial portions thereof during the period * * *, then the court charges you that he was not so disabled." We think this instruction was properly refused. The performance of substantial work by the assured was not, under the Missouri decisions, conclusive on the

question of disability. As we have already pointed out, the question is whether he was able to perform substantially all his duties in the usual and customary manner without running the risk of increasing his disability' or shortening his life. We think the instructions read as a whole fairly and intelligently submitted the issues to the jury and were not prejudicial to the defendant.

The judgment appealed from is therefore affirmed.