Lillian B. BROWN, Plaintiff-Respondent,

v.

METROPOLITAN LIFE INSURANCE COMPANY, a Corporation, Defendant-Appellant.

No. 47373.

Supreme Court of Missouri,
En Banc.

July 13, 1959.

Rehearing Denied Sept. 14, 1959.

---

Sherman Landau, St. Louis, for respondent.

Fordyce, Mayne, Hartman, Renard & Stribling, William W. Sleater, Jr., Robert P. Stanislaw, St. Louis, for appellant.

WESTHUES, Judge.

On January 14, 1935, the defendant Metropolitan Life Insurance Company issued a policy of insurance in the amount of $2,-000 upon the life of Joseph M. Brown. The policy provided for an additional payment of $2,000 as accidental benefits payable upon "due proof of the death of the insured, as the result, directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means, provided * * * (5) that death shall not have been the result of self-destruction, while sane or insane, or caused by or contributed to, directly or indirectly, or wholly or partly, by disease, or by bodily or mental infirmity; * * *."

The insured died on September 12, 1955. The defendant paid $2,000 to Lillian B. Brown, insured's widow, the beneficiary and plaintiff herein. Defendant refused to pay the additional $2,000 under the accidental death provision of the policy. Plaintiff filed this suit to collect that amount. A trial resulted in a verdict for plaintiff for $2,000 and $220 as interest. The defendant appealed to the St. Louis Court of Appeals which court reversed the judgment on the theory that the evidence was insufficient to sustain a finding that Brown's death was the result of accidental means. See 317 S.W.2d 651. On application of the plaintiff, we ordered the case transferred to this court.

The only question for determination here, as it was in the Court of Appeals, is whether the evidence justified a finding by a jury that death was the result of external violence or accidental means.

The evidence showed that Brown, when he died, was 54 years of age. He was a lawyer but was also engaged in the manufacturing business. He had an office on the second floor of the International Building, St. Louis, Missouri. In January, 1952, he was injured in an automobile accident. Thereafter, he did not overexert himself and as his widow expressed it, "He observed a very sedentary routine. We wouldn't go out of an evening anymore, used to retire early, and he was very careful of his diet." On the afternoon of September 12, 1955, at about 4:20 o'clock, Brown entered the International Building followed by a man named Byrnes. The evidence was that Byrnes was threatening Brown saying, "You put me away once. I will put you away for good." As Brown went to the elevator, Byrnes followed and continued to use language too vile to mention or print. This abuse continued while the two went up in the elevator. At the second floor, Brown left the elevator and Byrnes followed and continued to abuse him. As Brown walked to his office, Byrnes was seen to grab Brown's hat and at the same time either struck Brown in the back or pushed him. A witness said, "I described it as a hard pushing motion, as a blow." This pushing or blow caused Brown to stumble. Brown entered his office and in a short while, when attendants of the office building attracted by the disturbance went to Brown's office which was locked, they found him lying dead on the floor. A pool of blood was by his head.

Witnesses described Brown's condition as he passed through the lobby to the elevator and thence to his office as very nervous. Note the evidence of a witness:

"A. Well, in the elevator when I came in and this loud talking started, I looked at Mr. Brown. I observed his

face was white and that his hands were trembling, and then when they were on the second floor and walked by me at that time, again, I noticed his face and it was very, very white, and he seemed to be nervous."

Dr. Herman Blumenthal, a pathologist, testified that he made a post-mortem examination of Brown. We quote the following from the doctor's evidence:

"Q. Will you please tell us what you found as a result of your examination, and I guess, actually tell us what the positive findings are unless the negative findings are significant. A. We found two evidences of coronary occlusion, an old one and a recent or a fresh one.

"Q. Well, what did you find as to the cause of death? A. The medical cause of death was the fresh coronary occlusion.

\*   \*   \*   \*   \*   \*

"A. The heart has two coronary arteries which supply blood and through blood, oxygen to the heart muscle, and the heart is totally dependent upon those two coronary arteries for its ability to function. If for any reason, either of those coronary arteries is blocked off, that part of the heart which is supplied by that artery undergoes death. This does not necessarily mean the death of the patient. It may or may not depending upon a number of factors, the most important of which is how large an area of the heart is involved. In the case of Mr. Brown, he had had a block in one of those coronary arteries and apparently had survived that block some time prior to his death. He apparently had a second block at the time or approximately the time of his death."

In answer to a hypothetical question embracing the events preceding Brown's death, Dr. Blumenthal stated, "I think with reasonable medical certainty, it can be conclud-

ed that these events precipitated the occlusion of the artery which led to Mr. Brown's death." The doctor further testified as follows:

"Mr. Landau: By excitement and the blow. Actually, what I'm trying to determine are the accepted medical facts with reference to the effect of excitement on a person in Mr. Brown's condition.

\*   \*   \*   \*   \*   \*

"A. Yes, it's generally accepted in medicine that rather violent emotional disturbances can precipitate coronary attacks. Now, this is based on a matter of comparing events which led to coronary deaths and placing these on a statistical basis so that you know that certain events happen in coronary arteries that are more than just incidental circumstances. I don't think in this case, for example, one has to assume physical injury at all to account for precipitating factor, that the emotional disturbance alone could do it, and perhaps I should amplify that to say that in a patient with normal coronary arteries, that may not happen but in a patient with known impairment of coronary artery where the coronary artery function is a marginal sort of thing, emotional disturbances of this kind become quite critical.

\*   \*   \*   \*   \*   \*

"Q. (By Mr. Landau): Assuming it that way, Doctor, I will ask you whether such physical violence of that nature, would with reasonable medical certainty, produce overexcitement under the circumstances that I have outlined and in a person of Mr. Brown's then physical condition. A. Yes, produce excitement."

On cross-examination, Dr. Blumenthal testified as follows:

"Q. And it wasn't necessary that the other man put his hand on him, would it, to bring about his death? A.

It could happen without his touching him, yes.

"Q. The condition was such that Mr. Brown was going to pass on no doubt from this overexcitement, extreme excitement, is that right? A. It's possible, yes.

"Q. So that this pushing movement on Brown's back, after which—and he has been in this highly excited state for some time; the evidence was about coming in the building and in the elevator and down the hall, then this pushing movement of one hand would be superficial movement, wouldn't it, as far as Mr. Brown proceeding to his death because of this highly excited condition? A. I don't know how superficial any of these events are. I wasn't there to grade their severity. All I can say is the sum total of events as they have been put to me can produce this thing."

Dr. John J. Connor, a specialist in pathology, testified for the defendant that the cause of Brown's death "(1) was coronary occlusion, (2) coronary sclerosis, and (3) old myocardial infarction." He further testified that, in his opinion, the blow Brown received had nothing to do with his death. On cross-examination, Dr. Connor gave the following testimony:

"Q. Would that excitement do any good to Mr. Brown in his condition? A. No, sir.

"Q. It's well calculated to bring about death, isn't it? A. You mean in Mr. Brown's condition?

"Q. That's what I'm talking about. A. It's possible to bring about an acute coronary attack, yes."

Other facts which we are taking into consideration, though not here stated, appear in the opinion of the Court of Appeals.

■ The Court of Appeals, after summarizing the evidence, made the following conclusions, 317 S.W.2d loc. cit. 654(3–5): "The doctor (meaning Dr. Blumenthal, plaintiff's witness) further stated that, excluding the physical violence, the emotional disturbance alone caused by the arguing and cursing could have caused the heart failure. This testimony did no more than present evidence that any one of three things was the possible cause of Brown's death. The blow could have been the cause, the argument could have been the cause, or the combination of both could have been the cause. The burden was upon the plaintiff to show the cause of death. * * * Without some showing as to which of the possible causes did produce death, there is no basis upon which the jury could conclude that it was one cause or another." It is our opinion that the evidence was sufficient to sustain a finding that a combination of the vile language of Byrnes and the assault or blow caused Brown's death. The jury may have concluded that the vile language and the threats caused Brown to be in fear of an assault and caused high excitement, but had no assault occurred, Brown may have survived; further, that the blow by Byrnes which occurred just before Brown entered his office was "the last feather that (broke) the horse's back." Dr. Blumenthal so testified, as stated above, when he said, "I think with reasonable medical certainty, it can be concluded that these events precipitated the occlusion of the artery which led to Mr. Brown's death." If that be true, then the defendant is liable under the insurance contract sued on.

■ The Court of Appeals ruled, and we think correctly, that Brown's heart condition may have been a remote and predisposing cause but not the proximate cause of death and that such fact, that is, the heart condition, would not exempt the defendant from liability. Beckerleg v. Locomotive Engineers' Mut. Life and Accident Ins. Ass'n, Mo.App., 274 S.W. 917, loc. cit. 922

(10, 11). In the case of Mutual Benefit Health and Accident Ass'n v. Francis, 148 F.2d 590, the United States Circuit Court of Appeals (8 Cir.), in applying Missouri law, ruled that the evidence in that case justified a submission to a jury whether the accident caused death. The evidence of the doctors was of no more probative force in that case than the evidence in the case before us. See 148 F.2d loc. cit. 594(5, 6). In that opinion, on page 594(3, 4), the court said, "The Missouri appellate courts have held that if an accident sets in motion agencies that result in death, such injury is regarded as the sole, direct and proximate cause of death, even though the injured person were suffering from physical infirmity or disease. An injury which causes the death of a person in impaired health or suffering from disease is the cause of his death even though he would not have died if his health had not been impaired." Cases from other jurisdictions support the Missouri rule. Brooks v. Metropolitan Life Ins. Co., 27 Cal.2d 305, 163 P.2d 689, loc. cit. 691(5) (6, 7); Pierce v. Pacific Mut. Life Ins. Co. of California, Wash., 109 P.2d 322, loc. cit. 327, 328(5) (6) (7); Emergency Aid Ins. Co. v. Connell, 258 Ala. 521, 63 So.2d 603; Inter-Ocean Casualty Company v. Scott, 91 Ga.App. 311, 85 S.E.2d 452; Kilgore v. Reserve Life Insurance Company, 231 S.C. 111, 97 S.E.2d 392, loc. cit. 395(3); Mutual Ben. Health & Accident Ass'n v. Webber, 299 Ky. 846, 187 S.W.2d 273; North American Ins. Co. v. Ellison, 37 Tenn.App. 546, 267 S.W.2d 115; see also 45 C.J.S. Insurance § 776c, pp. 811, 812, and cases cited under Notes 52, 53, 54, and 55.

It is our opinion that the trial court did not err in submitting this case to a jury for determination.

The judgment of the trial court is hereby affirmed.

All concur except EAGER, J., who dissents feeling that the case was correctly decided by the Court of Appeals.